# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 04-2402

YAHONG ZHENG,

*Petitioner*,

v.

ALBERTO R. GONZALES,[1]
Attorney General of the United States,

*Respondent.*

———————

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A79-287-264

———————

ARGUED MARCH 29, 2005—DECIDED MAY 24, 2005

———————

Before CUDAHY, WOOD, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Yahong Zheng petitions for review
of an order of the Board of Immigration Appeals ("BIA") af-
firming the denial of her claim for withholding of removal
under 8 U.S.C. § 1231(b)(3). Zheng, a native of China, argues
that she established eligibility for relief because she was per-
secuted under a "coercive family planning program" within

———————

[1] Pursuant to FED. R. APP. P. 43(c), we have substituted Alberto
R. Gonzales for John D. Ashcroft as the named respondent.

the meaning of the expanded definition of "refugee" in 8 U.S.C. § 1101(a)(42)(B). Zheng testified that she was repeatedly subjected to the involuntary insertion of intrauterine devices ("IUDs") after she and her husband had a child without obtaining a "birth permit" from the Chinese government. The BIA assumed that Zheng's testimony was credible and also assumed that the involuntary insertion of IUDs constitutes persecution pursuant to a "coercive population control program" for purposes of § 1101(a)(42)(B). Nonetheless, the BIA denied Zheng's claim for relief because it found her evidence "lack[ed] sufficient detail to meet her burden of proof." Because the BIA's decision is not supported by substantial evidence, we grant the petition for review.

## I. Background

### A.  Facts

Zheng is a 36-year-old native of Guangtao Village in Fujian Province in the People's Republic of China. She married Xing Dong in 1990. The couple registered the marriage in February 1991 and were fined for filing the registration late. Zheng gave birth to a son in November 1991 without having received a "birth permit" from the Chinese government. She testified that during her pregnancy her husband's employer threatened to fire him if she did not have an abortion and that her husband was in fact fired from his factory job after their son's birth. Zheng submitted a copy of her husband's notice of termination, dated February 6, 1992, which corroborates her testimony. The notice states that Xing Dong resisted the "education and persuasion" of his supervisors and "argued with the Birth Control officer several times." The notice further provides that pursuant to China's "Population and Family Planning Law" and Fujian Province's "Family Planning Stipulations," the factory's Communist Party Committee terminated Xing Dong's em-

ployment in order to "maintain our factory's honor on Birth Control matters and to educate other workers in this factory." Xing Dong left China in March 1992 and has since been living in the United States, except for a brief return to China in 1996 to attend to his ailing mother.

Zheng testified that after her son was born, she and her husband were identified as "Birth Planning Targets" and she was repeatedly required to submit to involuntary insertion of IUDs in order to prevent further pregnancies. Zheng testified that Chinese birth control officers forced her to have an IUD inserted on three specific occasions. The first time, in May 1992, birth control officials came to Zheng's home and took her to a hospital where doctors implanted an IUD. Zheng testified that she contracted an infection from the procedure and also suffered from bleeding, headaches, and fatigue, which she attributed to the IUD. Zheng had the IUD removed by a private physician in January 1994. The removal was discovered at a quarterly checkup in May 1994, and a second IUD was inserted against her will. Zheng again had the IUD removed, and it was replaced with a third in December 1994.

Zheng provided copies of two written notices of "Implementation of Birth Control Measures," which corroborate that she and her husband were identified as "Birth Planning Targets" by the Villagers Committee of Guangtao because they had one child. The notices, dated 1998 and 1999, reiterate China's "Birth Planning" policy and urge that she "enthusiastically respond to the calling of the government" and report for a "Female Examination" by a certain date or face "necessary corresponding administrative measures." Zheng had the third IUD removed in 1999 and left China for the United States in 2000.

In her testimony and affidavit in support of her asylum application, Zheng stated that she entered the United States through Mexico in August 2000, after a four-day journey on

foot. However, the government asserts, without citing record evidence, that Zheng told an INS agent during her asylum interview that she flew to Los Angeles and passed through the airport without being stopped by immigration officials. Zheng's written asylum application contains no details about how she entered the United States, but at her hearing she denied ever having told an immigration official that she arrived in the country at a Los Angeles airport.

Zheng rejoined her husband, who was living in New Lenox, Illinois, and in July 2001 she gave birth to a second child, a daughter. She testified that as the mother of two children, and because of her past violations of China's population control policies, she would likely be subjected to involuntary sterilization and other punishment, including jail, if removed to China.

### B. Case History

Zheng filed her asylum application in May 2001, just before the birth of her daughter, and also sought withholding of removal and relief under the Convention Against Torture (CAT). After an interview with an INS officer, her petition was rejected and the INS filed a Notice to Appear charging her with removability under 8 U.S.C. § 1227(a)(1)(A). Zheng conceded removability and a hearing was held in February 2003 before an Immigration Judge ("IJ"). The IJ denied all forms of relief and ordered Zheng removed to China.

Regarding Zheng's asylum claim, the IJ first determined that Zheng had not established the time, date, and manner of entry to show that she filed for asylum within one year of arrival in the United States, as required by 8 U.S.C. § 1158(a)(2)(B). However, the IJ also addressed the merits of Zheng's asylum application, concluding that she was not credible and thus had not established that she suffered past persecution "by the alleged IUDs." The IJ also denied Zheng's claim for withholding of removal under § 1231(b)(3),

which is not subject to the one-year deadline applicable to asylum claims. The IJ determined that Zheng had not demonstrated the clear probability of persecution required for such relief because she was not a credible witness. The IJ also relied on this adverse credibility finding to deny Zheng's claim for relief under the CAT.

Zheng appealed the IJ's order of removal to the BIA. Zheng argued that she was eligible for asylum because she was a "refugee" within the meaning of the Immigration and Nationality Act ("INA") as a person who resisted a "coercive population control program." The INA defines a "refugee" as a person who is unable or unwilling to return to the country of his nationality because of "persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") amended the definition of "refugee" to cover certain applicants seeking relief from China's one-child policy who before the amendment could not establish persecution on one of the five enumerated grounds. *See Lin v. Ashcroft*, 385 F.3d 748, 752 (7th Cir. 2004).

Under the amended statute, an applicant may establish past persecution on account of political opinion if she: (1) has been forced to abort a pregnancy, (2) has undergone involuntary sterilization, (3) has been persecuted for failing or refusing to undergo either such procedure, or (4) has been persecuted for "other resistance to a coercive population control program." 8 U.S.C. § 1101(a)(42)(B); *Lin*, 385 F.3d at 752. Zheng argued that she met the statutory definition because she credibly testified that she suffered past persecution by the involuntary implantation of IUDs and resisted China's population control policy by having the IUDs removed illegally.

Zheng also argued that she established a likelihood of future persecution that was credible "in light of the family planning policy and practice in China" because as the mother

of two children, she would face involuntary sterilization if returned to China. Zheng asserted that the IJ unfairly relied upon State Department Country Reports in his decision; in particular, she challenged the IJ's reliance on the Country Reports to support his conclusion that "in urban areas . . . the one child policy is not strictly enforced"[2] and that Chinese tend to immigrate for economic rather that political reasons. Zheng argued that the State Department reports were outdated, internally inconsistent, inaccurate, and too generalized to permit an individualized assessment of her claim. Zheng also took issue with the IJ's conclusion that her husband was unlikely to have been fired for the couple's violation of China's family planning policies.

The BIA affirmed in a two-page opinion. The BIA agreed with the IJ that Zheng's asylum claim was statutorily time-barred and thus only reached the merits of her applications for withholding and relief under the CAT. The BIA did not accept the IJ's adverse credibility finding, but instead held that "even if we were to fully credit her testimony and assume that the insertion of IUD's [sic] constitutes a cognizable claim under section 101(a)(42) of the Act, her testimony lacks sufficient detail to meet her burden of proof."

The BIA noted that although Zheng claimed she had received medical attention in the United States for health problems resulting from the IUDs, she did not produce any documents to corroborate that treatment. The BIA also found it "particularly critical" that Zheng's husband was present in the United States but did not testify in corroboration of her story. The BIA also attached significance to the fact that Zheng had not been forcibly sterilized after she had the IUDs removed illegally. Finally, the BIA noted the

---

[2] The IJ presumably meant to state that the Country Report suggests that the one-child policy is not rigidly enforced in *rural* areas, like the area where Zheng lived.

fact that Zheng's siblings and her husband's siblings had more than one child, which was "consistent with" the State Department's report that the one-child policy is not strictly enforced in the part of China where Zheng lived. For these reasons, the BIA concluded that Zheng had not established that it was "more likely than not that she will face either persecution or torture if returned to China."

## II.  Analysis

On this review Zheng has abandoned her argument that she is eligible for relief under the CAT because she has not discussed that claim in her opening brief. *Lin*, 385 F.3d at 750. Acknowledging our lack of jurisdiction to review asylum decisions based on the timeliness of the application, *see Zaidi v. Ashcroft*, 377 F.3d 678, 681 (7th Cir. 2004), Zheng also does not seek review of the denial of her asylum claim. The only issue before us is the denial of Zheng's claim for withholding of removal.

A preliminary question is whether to limit our review to the BIA's opinion or consider the IJ's decision as well. Typically when the BIA issues an opinion, that opinion becomes the basis of review. *Niam v. Ashcroft*, 354 F.3d 652, 655 (7th Cir. 2004). But if the BIA merely supplements the IJ's decision, we review the decision of the IJ as supplemented by the BIA. *Id.* at 655-66. Our reading of the BIA's opinion is that it is not merely supplemental. Indeed, the BIA did not accept the IJ's credibility determination, but, rather, evaluated the case on the assumption that Zheng's testimony was fully credible. Accordingly, we will limit our review to the BIA's opinion.

A denial of an application for withholding of removal will be affirmed if supported by substantial evidence. *Nigussie v. Ashcroft*, 383 F.3d 531, 534 (7th Cir. 2004). We will not reverse a decision of the BIA unless the evidence compels the contrary conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478,

481 (1992); *Nigussie*, 383 F.3d at 534. To establish eligibility for withholding of removal under 8 U.S.C. § 1231(b)(3), Zheng has the burden of demonstrating a clear probability of persecution if removed to China. *See Prela v. Ashcroft*, 394 F.3d 515, 519 (7th Cir. 2005). A "clear probability" exists where the applicant demonstrates that it is "more likely than not" that she would be persecuted if returned to her native country. *Id.* If an applicant establishes that she has been subjected to past persecution, a presumption arises that the persecution will continue upon her return. *Zaidi*, 377 F.3d at 681. "Even if an applicant cannot create a presumption of a well-founded fear of future persecution by affirmatively demonstrating past persecution, she can demonstrate a well-founded fear of persecution if the fear is subjectively genuine and objectively reasonable." *Diallo v. Ashcroft*, 381 F.3d 687, 699 (7th Cir. 2004). The standard for establishing eligibility for withholding of removal is more stringent and harder to meet than that for asylum. *Balogun v. Ashcroft*, 374 F.3d 492, 508 (7th Cir. 2004); *Dobrican v. INS*, 77 F.3d 164, 168 (7th Cir. 1996).

As we have noted, the BIA assumed the credibility of Zheng's testimony and also assumed that the involuntary insertion of IUDs constitutes "a cognizable claim" of persecution on account of political opinion under amended definition in 8 U.S.C. § 1101(a)(42)(B). Nonetheless, the BIA concluded that Zheng's testimony "lacks sufficient detail to meet her burden of proof." The record simply does not support this conclusion. If Zheng's testimony is accepted as true (the BIA assumed this); and if repeated involuntary insertion of IUDs constitutes persecution for resistance to a coercive population control program under § 1101(a)(42)(B) (the BIA assumed this as well); then Zheng necessarily has met her burden of proving past persecution and "is automatically entitled to the presumption of a well-founded fear of future persecution." *Lin*, 385 F.3d at 757; 8 C.F.R. § 1208.13(b)(1).

Zheng testified with specificity that she gave birth to a child without a birth permit, was identified as a "Birth Planning Target," and thereafter on three occasions had an IUD inserted against her will. She further testified that the IUDs caused health problems that included bleeding and headaches. She likewise provided specific testimony about where and when she had the IUDs illegally removed. Having assumed the full credibility of Zheng's testimony, the BIA's rejection of her claim for lack of "sufficient detail" is inexplicable.

The BIA apparently expected corroboration from Zheng's American doctor and also from her husband. In applying the corroboration rule, an IJ (or the BIA) must provide: (1) an explicit credibility finding, (2) an explanation of why it is reasonable to expect additional corroboration, and (3) an account of why the petitioner's explanation for not producing that corroboration is inadequate. *Gontcharova v. Ashcroft*, 384 F.3d 873, 877 (7th Cir. 2004). But we have repeatedly held that corroboration is *not* required when an applicant testifies credibly. *Lin*, 385 F.3d at 751; *Uwase v. Ashcroft*, 349 F.3d 1039, 1041 (7th Cir. 2003). Here, the BIA assumed Zheng's complete credibility. Given this assumption, the BIA's application of the corroboration rule was misplaced.

Zheng's testimony was sufficiently specific as to time, place, and pertinent details regarding the IUD insertions and removals. She also supplied documentary evidence of the termination of her husband's employment as a result of the couple's violation of China's childbirth restrictions, as well as copies of two notices identifying the couple as "Birth Planning Targets" and requiring her to submit to "Female Examinations." Absent a sound reason to doubt her credibility, we cannot see how Zheng's testimony and documentary evidence lacked the specificity required to carry her burden of proving past persecution.

The BIA also concluded that "the claimed threat of sterilization has not been demonstrated on this record" because Zheng "was not sterilized when she was required to return for IUD insertion on several occasions after having them illegally removed." The BIA opinion also refers to Zheng's "family history" as being "consistent with the State Department's assessment that the one-child policy is not rigidly enforced in her area." Zheng testified that her husband's siblings have two, three, and four children, respectively, and her own siblings have one and two children, respectively (the BIA opinion incorrectly states that Zheng's siblings had two and three children, respectively). However, the record does not tell us whether Zheng's nieces and nephews were born with or without official permission, or whether her relatives were identified as "Birth Planning Targets" and subjected to involuntary IUD insertions as a result of their own childbearing histories, or whether they resisted China's population control policy by having IUDs illegally removed. Without this additional evidence, the childbearing histories of Zheng's siblings and in-laws have only limited relevance to her claim.

In any event, these are precisely the circumstances that make Zheng a target for persecution if she returns to China. Zheng has repeatedly defied China's population control policy—perhaps others in her family have as well. Although State Department Country Reports are entitled to deference, they cannot substitute for an individualized determination of an asylum or withholding claim; we have cautioned against "over-reliance" on the Country Reports because of their potential for bias and the inability of asylum seekers to question their conclusions. *Lin*, 385 F.3d at 754; *Diallo*, 381 F.3d at 700. That Zheng was not forcibly sterilized for her past birth control violations does not make it less likely that she will face involuntary sterilization in the future. On this record there is a reasonable contrary inference— that the threat of involuntary sterilization is now likely to be

*greater* based on her continued defiance of her country's population control policy by having a second child.

Accordingly, having assumed the credibility of Zheng's testimony, the BIA's conclusion that her evidence was insufficiently detailed to carry her burden of proof is not supported by substantial evidence. As we have noted, IIRIRA expanded the statutory definition of "refugee" in § 1101(a)(42)(B) to provide that forced abortion and involuntary sterilization are forms of persecution on account of political opinion. *Lin*, 385 F.3d at 752. The amended definition also specifies that persecution for "failure or refusal to undergo such a procedure" constitutes persecution on account of political opinion, as does persecution for "other resistance to a coercive population control program." *Id.* Finally, the definition provides that a person who has a well-founded fear that she will be forced to undergo an abortion or involuntary sterilization or will be persecuted for failing or refusing to do so, or has a well-founded fear of persecution for resisting a "coercive population control program" "shall be deemed to have a well-founded fear of persecution on account of political opinion." 8 U.S.C. § 1101(a)(42)(B).

We recently suggested that credible evidence of involuntary insertion of IUDs and required female medical checkups might establish persecution under a "coercive population control program" and that having IUDs removed by a private doctor may constitute "resistance" to such a program. *Lin*, 385 F.3d at 757. *Lin* involved an asylum applicant from China who testified to two involuntary abortions and three involuntary IUD insertions. *Id.* at 749-50. We rejected the IJ's adverse credibility finding because it was not supported by substantial evidence and remanded for reconsideration of the claim. *Id.* at 757 (remanding for reconsideration of whether two forced abortions constitutes past persecution under the expanded definition and also whether "three involuntary IUD insertions and mandatory checkups could constitute persecution as a 'coercive population control pro-

gram' under the amended statutory definition or whether [petitioner's] efforts to have the IUDs removed by private doctors is the type of 'resistance' that Congress sought to protect").

Thus far, however, no court of appeals has decided whether persecution under the expanded definition of "refugee" can be established on the basis of forcible IUD insertions alone. *Cf. Wang v. Ashcroft*, 341 F.3d 1015, 1020 (9th Cir. 2003) (holding that alien established past persecution "through two forced abortions and an IUD insertion"). The BIA assumed that the answer to this question is "yes." The agency thus assumed rather than decided the heart of this case.

By assuming rather than deciding that Zheng was credible and that the repeated involuntary insertion of IUDs constitutes persecution within the meaning of § 1101(a)(42)(B), the BIA has provided us with scant basis for review. *See Iao v. Gonzales*, 400 F.3d 530, 534 (7th Cir. 2005) (when the immigration decision merely assumes credibility and says that an applicant "hasn't carried her burden of proof, the reviewing court is left in the dark"); *Diallo*, 381 F.3d at 699 (citing with approval *Krastev v. INS*, 292 F.3d 1268, 1279 (10th Cir. 2002) ("we caution the BIA that its practice of simply assuming, without deciding, credibility is not favored")); *Cordon-Garcia v. INS*, 204 F.3d 985, 993 (9th Cir. 2000) (statements such as "even were we to assume that the respondent was a credible witness" do not allow the reviewing court to "undertake a meaningful analysis"). For the reasons we have noted above, the BIA's sole ground for rejecting Zheng's claim—that she had not met her burden of proof— was largely unreasoned and unsupported by the record. "[W]e are not authorized to affirm unreasoned decisions." *Iao*, 400 F.3d at 535.

Accordingly, we GRANT the petition for review and REMAND for further proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*