# Matter of M-F-W- & L-G-, Respondents

*Decided October 6 , 2008*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1)  An act that thwarts the goals of China's family planning policy, such as removing an intrauterine device ("IUD") or failing to attend a mandatory gynecological appointment, may constitute "resistance" to the policy.

(2)  The insertion of an IUD does not rise to the level of harm necessary to constitute "persecution," absent some aggravating circumstances.

(3)  Generally, where the insertion or reinsertion of an IUD is carried out as part of a routine medical procedure, an alien will not be able to establish the required nexus, i.e., that the procedure was or would be *because of* her resistance to China's family planning policy.

FOR RESPONDENTS:  Robert J. Adinolfi, Esquire, New York, New York

FOR THE DEPARTMENT OF HOMELAND SECURITY:  Susan M. Beschta, Assistant Chief Counsel

BEFORE:  Board Panel:  FILPPU, COLE, and PAULEY, Board Members.

COLE, Board Member:

In a decision dated March 1, 2002, an Immigration Judge found the respondents, a mother and son from China, removable and denied their applications for asylum, withholding of removal, and protection under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46. 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture").  The Immigration Judge held that the lead respondent, upon whose experiences the applications for relief are based, failed to establish a well-founded fear of sterilization because the evidence supported the conclusion that she would likely only be fined for removing an intrauterine device ("IUD") after the birth of her first child and for having a second child here in the United States.

In a decision dated October 14, 2003, we affirmed the Immigration Judge's decision and dismissed the respondents' appeal.  We also held that IUD insertion does not fall within the amended definition of the term "refugee" in

section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42) (2000), and agreed with the Immigration Judge that the respondent failed to establish a well-founded fear of sterilization or imprisonment if returned to China.[1]

On April 28, 2006, the United States Court of Appeals for the Second Circuit signed a Stipulation and Order of Settlement and Dismissal remanding the record for our reconsideration. The order requires us to explain why an alien who is subject to the forcible insertion of an IUD, and any attendant pain or discomfort, does not fall within the definition of a refugee. It also asks that we specifically address the respondent's claim that she fears persecution if returned to China based on her second pregnancy in light of *Huang v. U.S. INS*, 421 F.3d 125 (2d Cir. 2005).

Following the Second Circuit's order, the respondents submitted a brief, which includes a motion to remand. The Department of Homeland Security ("DHS") opposes the motion. Upon consideration of the issues the court has directed us to address and those presented in the motion, we will dismiss the respondents' appeal again and deny their motion to remand. The respondents' request for oral argument is denied. 8 C.F.R. § 1003.1(e)(7) (2008).

## I. FACTUAL AND PROCEDURAL HISTORY

The respondent has indicated that she was married in China in May 1989.[2] After the birth of her first child, a son, on July 23, 1990, Chinese officials took the respondent to the hospital where she had an IUD inserted on April 24, 1991.[3] She experienced discomfort, including back pain and an irregular menstrual cycle, and she asked Chinese officials if she could have the device removed. She was told that her problems did not warrant removal of the IUD.

In 1992, the respondent hired a private doctor to remove the IUD. She did not attend several required gynecological checkups because she feared the removal would be detected. In January 1993, officials came to the respondent's home and took her to have a gynecological examination. They discovered that the IUD was missing and detained her for 3 days because she refused to have another IUD inserted. The respondent stated that she felt

---

[1] When referring to the respondent in the singular throughout this order, we refer to the lead respondent.

[2] We note that the majority of the facts stated in this section were taken from the respondent's asylum application because she chose not to testify about the merits of her claim.

[3] The respondent's husband had already left China in 1990 because of his alleged involvement in the student democracy movement.

harassed and she eventually agreed to a second IUD, but she was only released when her mother-in-law paid a bribe.

Five years later, in January 1998, the respondent attempted to leave China but was caught in Hong Kong, detained for 4 months, and sent back. She was fined 20,000 RMB for leaving China illegally and for missing required gynecological exams. She eventually left China and arrived in the United States in January 2000. The record contains evidence that she had the IUD removed in 2000 by a doctor in New York. She gave birth to a second child in 2002. The respondent sought relief from removal based on her persecution claim because she fears sterilization and incarceration for violating China's family planning policy.

## II.  FORCED ABORTION AND STERILIZATION AS A PER SE GROUND FOR GRANTING ASYLUM

Section 601(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-689 ("IIRIRA"), which is codified at section 101(a)(42) of the Act, added the following language to the definition of a "refugee":

> For purposes of determinations under this Act, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

This amendment to the Act made clear that aliens who allege they have been forced to abort a pregnancy or who have been forcibly sterilized pursuant to China's family planning policy, or those who fear being subjected to such procedures, can establish eligibility for asylum. *See Shi Liang Lin v. U.S. Dep't of Justice*, 494 F.3d 296, 307 (2d Cir. 2007) (en banc). As the Attorney General noted in *Matter of J-S-*, 24 I&N Dec. 520 (A.G. 2008),

> Section 601(a) thus created four new and specific classes of refugees:
>
> 1. "person[s] who ha[ve] been forced to abort a pregnancy";
> 2. "person[s] who ha[ve] been forced . . . to undergo involuntary sterilization";
> 3. "person[s] . . . who ha[ve] been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program"; and
> 4. "person[s] who ha[ve] . . . a well founded fear that [they] will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance."

*Id.* at 527 (overruling *Matter of S-L-L-*, 24 I&N Dec. 1 (BIA 2006), and *Matter of C-Y-Z-*, 21 I&N Dec. 915 (BIA 1997)).  The first and second categories of aliens are "deemed" by section 601(a) of the IIRIRA to be refugees; that is, "their political opinion exists *de jure* rather than as a matter of fact on which the applicant bears the burden of proof."  *Shi Liang Lin v. U.S. Dep't of Justice*, *supra*, at 307; *see also Matter of J-S-*, *supra*, at 527-28.   If the respondent can establish that she fits within either of the first two categories, she need not show why the persecution was perpetrated.

We find that neither category applies to the respondent.  It is clear that having to use an IUD does not amount to being forced to abort a pregnancy.  The same can ultimately be concluded about the second category involving forced sterilization, particularly when analyzed pursuant to recent case law interpreting section 601(a) of the IIRIRA.  *Shi Liang Lin v. U.S. Dep't of Justice*, *supra*; *Matter of J-S-*, *supra*.[4]  One could argue that the perpetual use of an IUD, or any other birth control method, throughout a woman's child bearing years until menopause effectively results in a form of sterilization.  However, the verb to "sterilize" is defined as "to make sterile," which means "[i]ncapable of sexual reproduction."  *Webster's II New Riverside University Dictionary* 1137 (1994).  This definition makes clear the permanency of the sterilization procedure—i.e., that it leaves one *incapable* of having children—and leads us to reject the argument that IUD use should be treated as the equivalent of sterilization.

It is apparent from the legislative history prior to enactment of section 601(a) of the IIRIRA that Congress was aware that IUDs are used in China, and around the world, for that matter, as a method of *birth control*.  *See Coercive Population Control in China:  Hearings Before the Subcomm. on Int'l Operations and Human Rights of the House Comm. on Int'l Relations*, 104th Cong. 8, 18 (1995) (hereinafter *Hearings*).  Unlike sterilization, it is a temporary measure meant to provide for birth *planning* and not to remove all possibility of future birth opportunities.  Congress was clearly aware of China's use of IUDs as a birth control method separate from sterilization because both terms were used in describing China's family planning policy.  *Id.* at 8.  It is therefore our understanding that when referring to sterilization as a per se category of persecution that would render an alien eligible for asylum, Congress did not mean to include "lesser," i.e., less permanent, forms

---

[4]  Both the Second Circuit's decision in *Shi Liang Lin v. U.S. Dep't of Justice* and the Attorney General's decision in *Matter of J-S-* relied on statutory canons of construction—looking to the ordinary meaning of words used by Congress—and employed dictionary definitions to aid their analysis.  It is therefore appropriate to do so here, where the issue likewise turns on whether certain conduct was meant to be included within the provisions of section 601(a).

of birth control, such as IUD insertion. Since the respondent has not suffered either a forced abortion or forced sterilization, and she was not threatened with these procedures, she must show that she was or will be persecuted for "other resistance" to China's family planning policy, or that she was persecuted on account of another protected ground under the Act.[5]

## III. "OTHER RESISTANCE" TO CHINA'S POLICY

We agree with the DHS that when it has been determined that an alien has not suffered a per se form of persecution, i.e., an abortion or sterilization (or shown a well-founded fear of such a procedure in the future), she must establish that (1) she resisted China's family planning policy, (2) she has been persecuted (or has a well-founded fear of persecution), and (3) the persecution was or would be *because* of the respondent's resistance to the policy. *See Matter of J-S-*, *supra*, at 537-38.

### A. Resistance

With regard to establishing the first element, the DHS argues that merely removing an IUD is insufficient to constitute "resistance" in light of other language used in section 601(a) of the IIRIRA. According to the DHS, because an alien must *fail or refuse* to undergo an abortion or sterilization to establish acts that show a well-founded fear of persecution, the alien must likewise fail or refuse to allow the insertion of an IUD in order to show other resistance.

---

[5] The issue raised here—whether an alien can establish resistance, persecution, and nexus based on being coerced into having an IUD implanted to prevent pregnancy and, relatedly, having had that IUD removed without official permission—appears to be one of first impression and not one on which the Board or any Federal circuit court, other than the Fourth Circuit, has issued a precedent decision. *See Zheng v. Gonzales*, 497 F.3d 201, 203 (2d Cir. 2007); *Li v. Gonzales*, 405 F.3d 171 (4th Cir. 2005); *see also Li Fang Lin v. Mukasey*, 517 F.3d 685 (4th Cir. 2008); *Yang v. U.S. Att'y Gen.*, 418 F.3d 1198 (11th Cir. 2005); *Zheng v. Gonzales*, 409 F.3d 804 (7th Cir. 2005); *Lin v. Ashcroft*, 385 F.3d 748 (7th Cir. 2004); *Zi Lin Chen v. Ashcroft*, 362 F.3d 611 (9th Cir. 2004); *Fang v. Ashcroft*, 114 Fed. Appx. 486 (3d Cir. 2004) (unpublished); *cf. Wang v. Ashcroft*, 341 F.3d 1015 (9th Cir. 2003). This list of cases is not meant to be exhaustive but suffices to show that guidance on this issue is necessary. We want to make clear, however, that we are adjudicating the issue of IUD insertion or removal of an IUD and whether it constitutes "other resistance" as a means of meeting the definition of a refugee in the Act solely in the context of China's family planning policy.

While we agree that our interpretation of the term "resistance" should be informed by how the phrase "other resistance" is used in the statute, *see Shi Liang Lin v. U.S. Dep't of Justice*, *supra*, at 308-13, and *Matter of J-S-*, *supra*, at 530,[6] we disagree that removal of an IUD cannot qualify as resistance. Unlike the principal dictionary definition of the word "resist," which would ordinarily entail the use of force,[7] "other resistance" is used in section 101(a)(42) of the Act *after* the mention of persons who have been persecuted for "failure or refusal" to undergo an abortion or sterilization. Accordingly, we believe that the reference to "other resistance" must be assessed against the failures or refusals to comply with official demands to adhere to birth planning policies. This would include resistance such as removing an IUD or failing to attend a mandatory gynecological appointment because such acts, while arguably not comprising active or forceful opposition to China's family planning policy, would certainly thwart the goals of the plan and be viewed with disfavor by Chinese officials implementing the plan.

Most importantly, we read the statute as treating a "failure" or "refusal" to undergo an abortion or sterilization as a form of "resistance." Thus, the phrase "*other* resistance" can include both failures and refusals to comply with China's coercive population control practices, but not simple grudging compliance.[8] In any case, an alien must still show that the claimed persecution is because of such resistance.

---

[6] *See also Matter of J-S-*, *supra*, at 534-38. As the Attorney General stated in that case,

> The reason section 601(a) makes an applicant's "resistance" to a coercive population control program the trigger for refugee status is obvious: If mere enforcement of a coercive population control program were the trigger, most of China's population would qualify as refugees under the provision. That is not what section 601(a) provides. Section 601(a) extends political asylum to persons who have been, or who have a well-founded fear of being, "persecuted on account of" their "resistance" to a coercive population control program. Section 101(a)(42)(A) of the Act. It then spells out that certain specific persons—namely, persons who are "forced to undergo" abortion or sterilization "procedure[s]" required by a coercive population control program—are per se considered to have engaged in the kind of "resistance" necessary for asylum. *Id.* By contrast, persons who cannot show they have undergone such procedures must prove persecution or a well-founded fear of persecution for "fail[ing] or refus[ing]" to undergo such procedures or for some "other resistance" to a coercive population control program to qualify as refugees. *Id.*

*Id.* at 534.

[7] The word "resist" is defined as "[t]o oppose actively" or "[t]o oppose with force." *Webster's II New Riverside University Dictionary*, *supra*, at 1000.

[8] A woman who opposes mandatory IUD insertion but nevertheless shows up and undergoes the procedure has not established "other resistance" on these facts standing alone.

## B. Persecution

Even if the alien can show resistance, it is still necessary to establish that any resulting punishment constitutes persecution, as opposed to less serious sanctions meant to pressure the alien into submission. It is important to note that the words "persecuted" and "persecution" in section 601(a) of the IIRIRA derive their meaning from the standard use of these terms in contexts other than those related to population control. They do not enjoy some special separate meaning within the context of section 601(a) cases. Aside from cases where persecution has been established per se because an alien was forced to abort or was forcibly sterilized, all aliens alleging refugee status must show harm that is persecutory in nature, and not merely harassment or discomfort. *See id.*; *see also Matter of T-Z-*, 24 I&N Dec. 163, 167-69 (BIA 2007) (assessing the meaning of a "forced" abortion by reference, in part, to persecution, and relying on the general statutory meaning of persecution).

The Second Circuit has found that harassment includes words, conduct, or action that annoys, alarms, or causes substantial emotional distress, whereas persecution involves significant suffering or harm because of a protected ground in the Act. *Ivanishvili v. U.S. Dep't of Justice*, 433 F.3d 332, 340-42 (2d Cir. 2006); *see also Beskovic v. Gonzales*, 467 F.3d 223, 226 (2d Cir. 2006) (stating that "while 'the difference between harassment and persecution is necessarily one of degree,' the degree must be assessed with regard to the *context* in which the mistreatment occurs" (quoting *Ivanishvili v. U.S. Dep't of Justice*, *supra*, at 341)).

The Second Circuit has also noted that our unpublished decisions on this issue have to date been in conflict. *Zheng v. Gonzales*, 497 F.3d 201, 203 (2d Cir. 2007). For example, the court pointed to our decision in that case, stating that we found that the "involuntary insertion of an IUD, unaccompanied by any 'significant degree of pain or restriction' did not constitute persecution within the meaning of the [Act]." *Id.* (quoting the Board's decision). However, the court also cited our decision in a case arising in the Seventh Circuit, noting that we "'assumed that the involuntary insertion of IUDs constitutes persecution pursuant to a "coercive population control program."'" *Id.* (quoting *Zheng v. Gonzales*, 409 F.3d 804, 806 (7th Cir. 2005) (quoting the Board's decision)); *see also Jiang v. Bureau of Citizenship and Immigration Servs.*, 520 F.3d 132 (2d Cir. 2008) (remanding for clarification on IUD insertion as persecution where we affirmed an Immigration Judge's decision finding that coerced insertion of an IUD constituted persecution of others, which barred a grant of asylum to the alien).

These differing results do not stem so much from an inconsistent application of what we find to be persecution as from the fact that our determinations depend on the facts of each case. While there are often similarities between

cases alleging persecution on account of China's family planning policy, differences exist, which, even if merely nuances, can result in divergent outcomes.[9]   For example, in the Seventh Circuit's decision in *Zheng v. Gonzales*, 409 F.3d 807, the alien was repeatedly required to submit to involuntary insertion of IUDs. The first insertion resulted in an infection, bleeding, headaches, and fatigue before the alien had the IUD removed by a private doctor. IUDs were then inserted on two more occasions, and the alien had them removed. She fled for the United States after the third IUD was removed. The alien also provided evidence that she and her husband were identified as "Birth Planning Targets" by local family planning officials. *Id.* at 810.

The circumstances presented in the Second Circuit's case in *Zheng v. Gonzales*, 497 F.3d 201, were very different, making it relatively simple for us to decide that past persecution had not been established. The alien had had an IUD inserted and waited 11 years to have it removed. Unlike in the Seventh Circuit's *Zheng* case, the alien did not appear to resist the procedure. Facts such as these cannot support a finding of resistance to China's family planning policy (except for the unauthorized IUD removal itself) or of past persecution on account of that resistance.

While having an IUD inserted involuntarily is certainly intrusive and hinders a person's ability to control procreation, the temporary nature of its effects persuades us that such a procedure does not constitute persecution per se. Unlike forced abortion and sterilization, using an IUD does not generally have permanent effects, other than the loss of time during which to conceive. Absent evidence to the contrary, we find that under normal circumstances, the IUD user does not lose a child or the permanent opportunity to have a child, as is evidenced by the respondent's own ability to have a second child in the United States over a decade after having her first child. We therefore conclude that simply requiring a woman to use an IUD, and other more routine methods of China's implementation of its family planning policy, do not generally rise to the level of harm required to establish persecution. *See Li v. Gonzales*, *supra*, at 179 (noting that the insertion of an IUD is not considered persecution because "but for the fact that the procedure was required, the record contains no evidence that the procedure differed from

---

[9] Our decision that led to the Seventh Circuit's opinion in *Zheng v. Gonzales*, 409 F.3d 804, did not decide whether insertion of an IUD constituted persecution. We merely assumed that it did in order to avoid that issue because we found the alien's lack of detail determinative. Therefore, it does not actually conflict with other cases that found no persecution when an IUD was inserted or removed.

a voluntary IUD insertion, which typically does not cause substantial pain or lasting side effects"); *see also Matter of T-Z-*, *supra*, at 171-75 (discussing nonphysical forms of persecution).

As noted above, examples of routine acts implementing China's family planning policy that are lacking in harm sufficient to constitute persecution include reinsertion of an IUD after the removal of an IUD, fines for having removed the IUD that are not excessive, regularly required gynecological exams, and other routine fines and threats for disobeying the policy. *See, e.g.*, *Guan Shan Liao v. U.S. Dep't of Justice*, 293 F.3d 61, 70 (2d Cir. 2002) (stating that "economic deprivation may constitute persecution, [but] an . . . applicant must offer some proof that he suffered a 'deliberate imposition of substantial economic disadvantage'" (quoting *Yong Hao Chen v. U.S. INS*, 195 F.3d 198, 204 (4th Cir. 1999))); *see also Huang v. U.S. INS*, *supra*, at 129 (discussing modest fines for violation of the family planning policy); *Matter of T-Z-*, *supra* (finding that an abortion can be coerced by the use of threats of harm and that nonphysical forms of harm can amount to persecution, but applying a "severe economic disadvantage" test to claims of economic persecution). We note also that our conclusion regarding these less coercive forms of forcible birth control is supported by the fact that when Congress amended the definition of a "refugee" to include persecution based on China's family planning policy, it focused on sterilization and abortion. It is harm of this magnitude and permanency that Congress treated as automatically amounting to qualifying persecution.

There is no evidence to suggest that Congress intended to include IUD insertion or removal as an automatic basis for gaining relief when it amended the Act. While the hearings held before Congress just prior to amending the Act are filled with statements and testimony about China's coercive abortions and sterilization, *see Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 92 (2d Cir. 2001) (citing *Hearings*, *supra*), there is little that reflects the intent behind the addition of the "other resistance" clause. *See Yang v. U.S. Att'y Gen.*, 418 F.3d 1198, 1203 n.5, 1205 n.9 (11th Cir. 2005) (noting the dearth of legislative history regarding congressional intent in adding the "other resistance" clause and the minimal evidence highlighting the use and removal of IUDs in regard to China's policy and resistance thereto).

As noted by the Second Circuit, the language used by Congress to amend section 101(a)(42) of the Act, and thereby reject *Matter of Chang*, 20 I&N Dec. 38 (BIA 1989), was clear. *Shi Liang Lin v. U.S. Dep't of Justice*, *supra*, at 307. The amendments were aimed specifically at "the person[s] Congress understood to be most deserving of protection," that is, aliens who have been forced to undergo an abortion or involuntary sterilization or who fear such a procedure upon return. *Id.* at 312. Just as spouses of aliens forced to undergo abortion or sterilization are not automatically eligible for asylum, neither are

aliens who have undergone less extreme forms of family planning in China. Instead, they must show persecution, past or future, on account of a ground protected in the Act, which includes the "other resistance" provision in the statute.

We do not intend to imply that having an IUD inserted can never be found to be persecutive. However, to rise to the level of harm necessary to constitute "persecution," the insertion of an IUD must involve aggravating circumstances. *See Ivanishvili v. U.S. Dep't of Justice*, *supra*, at 341 ("[P]ersecution does not encompass mere harassment."); *Chen v. U.S. INS*, 359 F.3d 121, 128 (2d Cir. 2004) (holding that persecution means that conduct must rise above "'mere harassment,'" but it can include physical abuse short of life-threatening violence (quoting *Begzatowski v. INS*, 278 F.3d 665, 669 (7th Cir. 2002))). Further, should the harm associated with an IUD rise to the level of persecution, there must still be a link between the harm and the reasons for its infliction that establishes that it is the result of, or is on account of, other resistance or one of the protected grounds described in section 101(a)(42) of the Act.[10]

## C. Nexus

The statute requires that an alien must have been "persecuted . . . *for* other resistance to a coercive population control program" or have a well-founded fear of being "subject to persecution *for* such . . . resistance." Section 101(a)(42) of the Act (emphasis added). Thus, an important factor in these "other resistance" cases is whether the IUD is being inserted or reinserted *for* some resistance that the alien manifested, that is, to target certain individuals for punishment for, or because of, their opposition or resistance to China's family planning policy. *See Zheng v. Gonzales*, 409 F.3d 804; *cf. Li v. Ashcroft*, 356 F.3d 1153 (9th Cir. 2004) (finding persecution where the alien testified that she was restrained for more than half an hour while her uterus, vagina, and cervix were probed and that this examination closely followed a threat that she would "pay" for her outspoken opposition to China's family planning policy).

---

[10] We note that the respondents filed their application for asylum prior to May 11, 2005, so their application is not governed by amendments made by the REAL ID Act of 2005, Division B of Pub. L. No. 109-13, 119 Stat. 231. Pursuant to those amendments, "the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." Section 208(b)(1)(B)(i) of the Act, 8 U.S.C. § 1208 (b)(1)(B)(i) (2006). Even under the law in effect prior to enactment of the REAL ID Act, however, an asylum applicant must establish a nexus between the persecution alleged and a protected ground under the Act.

The question raised here and in many "other resistance" cases is whether the reinsertion of an IUD was because of the alien's resistance to the insertion of the first IUD, or because of its removal, or merely because reinsertion is a standard procedure in China. If the latter, an alien may be unable to meet her burden of establishing that the IUD insertion was "for," or because of, her resistance to China's policies. Rather, it would then be a routine medical procedure that is carried out regardless of the manner in which the first IUD was removed or fell out. This would not be sufficient to establish the nexus required under section 101(a)(42) of the Act. The statute requires more than proof of an act of resistance and an unconnected imposition of harm that rises to the level of persecution. There must be a link between the harm and the "other resistance."

## IV.  ANALYSIS

In reviewing this case, we focus specifically on the Second Circuit's directive to explain why the forcible insertion of an IUD, and any attendant pain or discomfort, does not fall within the definition of a "refugee." Applying the principles outlined above, we again find that the respondent has failed to meet her burden of proving eligibility for asylum and withholding of removal. We will therefore dismiss the appeal. We also find that it is not necessary to remand this case for further proceedings.

After the birth of her first child in 1990, the respondent was fitted with an IUD. There is no evidence to support a finding that the respondent resisted this initial birth control procedure. Even assuming coercion, however subtle, we find that the IUD insertion was not done to punish the respondent for some earlier transgression of the population control program, but rather was a routine part of the Chinese Government's family planning policy.

Furthermore, although the respondent testified that she experienced discomfort, back pain, and irregular menstrual cycles, her physical discomfort was not caused by the Government's desire to persecute her. Even assuming the pain and discomfort rose to the level of persecution, unless the respondent can link the IUD insertion to the Government's response to some "other resistance" she was believed to have engaged in, she cannot establish a nexus between the pain and any such "resistance." In other words, the physical side effects of having an IUD inserted must still be linked to the Chinese Government's actions to persecute her.

A separate question is whether the respondent's removal of the first IUD and her subsequent arrest, followed by the insertion of a second IUD, establish her eligibility for relief. Although we find that the respondent can show other resistance, we find that she is unable to establish the other elements required for refugee status. The respondent's removal of the first

IUD and her refusal to have a second one inserted, at least for 3 days while she was detained, qualify as resistance to China's family planning policy, because her actions thwart China's goals in preventing pregnancy through certain procedures. Nevertheless, the respondent's case is not one in which the pain rose to the level of persecution, and she has not reasonably established that the second IUD insertion was on account of other resistance. In fact, the facts presented paint a picture of discomfort resulting from the routine implementation of the family planning policy, rather than persecution. Three days of detention is not insignificant, and the respondent testified that she was harassed during that time, but she was not beaten or injured, and the collective harm she experienced, even considering that the detention was by the Government, did not rise to the level of persecutory harm. *See Beskovic v. Gonzales*, *supra*; *Matter of O-Z- & I-Z-*, 22 I&N Dec. 23 (BIA 1998).

Moreover, the fact that the respondent was merely fined in 1998 for leaving illegally and missing gynecological exams does not indicate that Chinese authorities were somehow singling her out for excessive implementation of the family planning policy. Nor do her experiences support the allegation that she will be sterilized upon return to China. Based on the evidence presented, the second IUD insertion appears to have involved the routine implementation of China's family planning policy, similar to insertion of the first IUD. Accordingly, we conclude that the respondent has not met her burden of establishing that she has been or will be persecuted on account of a protected ground in the Act, and we will again dismiss the appeal.

We also decline to remand based on the birth of the respondent's second child in 2002 after she had the IUD removed in 2000. As in *Huang v. U.S. INS*, *supra*, the respondent failed to make a prima facie showing that she will be persecuted for having a second child while here in the United States. *See Matter of S-Y-G-*, 24 I&N Dec. 247 (BIA 2007); *Matter of J-W-S-*, 24 I&N Dec. 185 (BIA 2007); *see also Matter of J-H-S-*, 24 I&N Dec. 196 (BIA 2007). The respondent requests a remand to present certain documents referenced in *Gao v. Gonzales*, 463 F.3d 109 (2d Cir. 2006), a case recently remanded by the Second Circuit to assess a claim of persecution based on foreign-born children. The remand in that case resulted in our decision in *Matter of S-Y-G-*, *supra*, where we held that the documents submitted, including those discussing local province and village family planning decisions, reflected general birth planning policies that did not specifically show any likelihood that the alien, or similarly situated Chinese nationals, would be persecuted as a result of the birth of a second child in the United States. *See Huang v. U.S. INS*, *supra*, at 129 (affirming our determination that Huang failed to establish he would be persecuted for having had children

abroad, and stating that "[i]n the absence of solid support in the record for Huang's assertion that he will be subjected to forced sterilization, his fear is speculative at best").

Similarly, in *Matter of J-W-S-*, *supra*, we found that although some sanctions may be imposed pursuant to local family planning policies in China for the birth of a second child abroad, the alien failed to provide evidence that such sanctions in Fujian Province, where the respondent is from, would rise to the level of persecution. As the respondents' case is clearly controlled by these precedent decisions, we find it unnecessary to engage in further review of this new evidence.

**ORDER:** The appeal is dismissed.

**FURTHER ORDER:** The motion to remand is denied.