**PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-2022

_____

FEI MEI CHENG
A/K/A PEI KWAN LEE,

Petitioner,

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

On Petition for Review of an Order
of the Board of Immigration Appeals

(Agency Case Number A077-354-013)

Argued July 12, 2010

Before: FUENTES, ALDISERT, and ROTH, <u>Circuit Judges</u>

(Opinion Filed: October 6, 2010)

Theodore N. Cox, Esq. [ARGUED]
Henry Hwang, Esq.
401 Broadway, Suite 701
New York, NY 10013

 Counsel for Petitioner

Briena L. Strippoli, Esq. [ARGUED]
Ann M. Welhaf, Esq.
Sada Manickam, Esq.
United States Department of Justice
Office of Immigration Litigation, Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

 Counsel for Respondent

---

OPINION OF THE COURT

---

FUENTES, Circuit Judge:

Fei Mei Cheng ("Cheng") is a citizen and native of China. While living in China's Fujian Province, Cheng became pregnant but under Chinese law was too young to marry her boyfriend. Over the course of her pregnancy, local family

-2-

planning officials employed a pattern of escalating threats in an effort to persuade her to abort the pregnancy, but Cheng resisted and gave birth to a daughter. In response to her resistance to the population control laws and to induce her to undergo a sterilization procedure, the officials confiscated the family farm and truck, forbade Cheng from working on the farm, threatened to take her newborn daughter away from her, and imposed various economic and other sanctions. Cheng was ultimately forced to have an intrauterine device ("IUD") inserted, and soon thereafter, she and her boyfriend fled to the United States. Upon arrival, she applied for protective relief, invoking 8 U.S.C. § 1101(a)(42), which makes eligible for asylum a "person who has been forced to . . . undergo involuntary sterilization, or who has been persecuted for . . . other resistance to a coercive population control program."

The Immigration Judge ("IJ") denied her application and the Board of Immigration Appeals ("BIA") affirmed, concluding, among other things, that Cheng had not been persecuted and that the mistreatment to which she was subjected was unrelated to her resistance to China's population control policies. We disagree with both of these conclusions and will therefore grant the petition for review.

## I.

### A.

The facts underlying Cheng's asylum application, which the IJ found credible and which are uncontested, are as follows. Cheng was born and raised in China's Fujian Province. Fujian

-3-

Province is "known for being a place where the one-child policy has been enforced with special vigor—a reputation that persists still today." Lin v. Mukasey, 517 F.3d 685, 688 (4th Cir. 2008) (quotation marks, brackets, and citation omitted). In June 1995, when she was nineteen years old, Cheng met and started dating Zailin Chen ("Chen"), a twenty-three-year-old man who lived in her village. Cheng became pregnant in March 1996. Although Cheng and Chen wanted to get married, the two were not permitted to wed because they fell below their village's age requirement for marriage—in the village, women were not permitted to marry before the age of twenty-three, and men were not allowed to be married before the age of twenty-five.

In May 1996 township officials discovered that Cheng was pregnant. The officials attempted to pressure Cheng into having an abortion, but she refused. The official responsible for birth control and family planning in Cheng's township, Feng Ying, then paid a visit to Cheng at her parents' home, where Cheng lived. Ying insisted that Cheng have an abortion and informed her that if she did not terminate her pregnancy, her reputation would be damaged and she would lose her job. Again, Cheng refused to comply with these demands. Approximately one month later, four township officials went to Cheng's home to confront her about the pregnancy. Cheng was not home at the time of the visit, but her mother was, and the officials warned her mother that if Cheng did not agree to have an abortion voluntarily, the officials would force her to do so.

As a result of these threats, Cheng and Chen went into hiding in another city, where they stayed with Chen's aunt. While Cheng and Chen were away, township officials returned

-4-

to Cheng's parents' house in the middle of the night. The officials were "furious" when they discovered that Cheng was not home, and they threatened her parents with seizure of the family's farm and truck, which were the source of the family's livelihood, if Cheng did not cooperate with the authorities and have an abortion. (App. at 736.)

Cheng continued to defy the officials' demands and gave birth to a daughter on January 1, 1997. When township officials learned that Cheng had given birth, they immediately followed through on their threat to confiscate the farm and truck, which Cheng and her family "depended on . . . to make a living." (Id.) In addition, Ying, the leader of the township's family planning cadre, went to Cheng's residence to inform the family that because Cheng had violated the law by refusing to have an abortion, the entire family was forbidden from working on the confiscated farm. Ying also ordered Cheng to participate in a six-month re-education program. Finally, the township government ordered that Cheng and Chen each be sterilized. Cheng's family members attempted on multiple occasions to persuade the officials not to compel the couple to be sterilized, but the officials rejected their requests. After their family members' unsuccessful conversations with township officials, Chen (whom Cheng characterized as young and temperamental) engaged in a physical altercation with a government officer and was detained.

During Chen's detention, the officials escalated the pressure on Cheng. They informed her that if she did not comply with their orders, the government would take her baby from her, and Chen would be detained for months. If Cheng

-5-

relented, however, they informed her that she could keep the baby, that Chen would be released, and that the confiscated farm and truck would be returned to Cheng and her family. To sweeten the deal, the officials informed Cheng that if she relented immediately, she would not have to be sterilized, but instead could have an IUD inserted. "Under such pressure and out of . . . concern about the fate of [the] new baby and [Chen]," Cheng acceded to the officials' orders. (Id. at 738.) As her declaration indicates, Cheng thought that she could change her mind and escape the procedure at the last minute, but she was immediately "dragged" to a minivan and driven to a medical clinic. (Id.) According to the unopposed statement in Cheng's declaration, an IUD is meant to be inserted when a woman is having her period; because she was not having her period at the time when she was forced to have the IUD inserted, the procedure was "very painful" and Cheng "screamed" in pain when the IUD was inserted. (Id.) After the procedure, she was required to submit to gynecological examinations every three months in order to verify the IUD's presence. She found it difficult to keep all of these appointments because she had to work in another city to make ends meet; whenever she missed an appointment, she was assessed a fine that she could not afford to pay.

Once her daughter was old enough, Cheng sought to send her to daycare. The township government informed Cheng that, because she had disobeyed the family planning laws, her daughter would not be permitted to attend daycare. She pleaded with township officials, who ultimately agreed to admit her daughter but required Cheng to pay twice the regular tuition on account of her violation of the population control laws.

Thereafter, township officials learned that one of Cheng's neighbors was attempting to have a baby in hiding in violation of the family planning policy. The officials forced the neighbor to undergo a sterilization procedure. During the procedure, Cheng's neighbor was treated "like a pig"—her hands and legs were tied, she was not given sufficient anesthesia, and she screamed throughout the operation. (Id. at 739.) Cheng knew that she would be exposed to the same harm if she ever attempted to have another child, which she intended to do. In 2000, she and Chen paid snakeheads to smuggle them out of China and into the United States.[1]

**B.**

Shortly after her arrival in the United States, Cheng was served with a Notice to Appear and charged with being removable pursuant to 8 U.S.C. § 1182(a)(6)(C)(1) and 1182(a)(7)(A)(i)(I). She applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). On November 1, 2005, the IJ convened a hearing at which Cheng testified to the facts reviewed above. Cheng further testified that she had given birth to a second child shortly after entering the United States, and that at the time of her testimony she was pregnant with a third child. She testified that she feared that if she were compelled to return to China with two foreign-born children, she would be sterilized.

---

[1] "A 'snakehead' is a professional smuggler of Chinese migrants." Lin, 517 F.3d at 687 n.1 (citation omitted).

The IJ, finding the entirety of Cheng's testimony credible, granted her application for asylum. In an oral decision, the IJ first found that Cheng had not satisfied her burden of proving that she was the victim of past persecution—the involuntary insertion of an IUD and the requirement that Cheng submit to regular gynecological examinations, the IJ concluded, were insufficiently severe to constitute persecution. Based upon the fact that Cheng "would return to China having three children with two of them being unauthorized," however, the IJ concluded that there was a reasonable probability that Cheng would be sterilized—and, therefore, persecuted, see 8 U.S.C. § 1101(a)(42)—if she were compelled to return to China. (App. at 277.) The IJ additionally noted that beyond the risk of sterilization, Cheng faced the prospect of incurring severe economic distress as a result of the fines and fees associated with violating China's family planning policies. The IJ thus granted Cheng's asylum application, but certified the matter to the BIA in light of the dearth of Board precedent on the issues raised by the case.

The BIA, in a non-precedential opinion, vacated the IJ's order and remanded the case for further proceedings. The BIA first concluded that mandatory IUD insertion alone does not bring a person within the definition of "refugee" in the Immigration and Nationality Act ("INA"). Additionally, the BIA observed that, following the IJ's decision in this case, it had issued two precedential decisions addressing the asylum applications of persons claiming to have been persecuted pursuant to China's one-child policies, which made it appropriate for the IJ to reconsider the case in light of the recent

-8-

decisions.[2] The BIA thus remanded the case to the IJ to address the impact of the new authority upon Cheng's asylum application.

On remand, the IJ denied Cheng's application. He explained that it was "curious and troublesome," (id. at 77), that the BIA had elected not to address the significance of Cheng's resistance to the IUD and the resultant harms she encountered for purposes of the asylum statute's "other resistance" prong,[3] but he interpreted the Board to have implicitly rejected Cheng's argument that she satisfied the "other resistance" criteria. § 1101(a)(42). As to whether Cheng had a reasonable fear of future persecution in the form of sterilization based upon her past experiences and the fact that she then had three children,

_____

[2] In these decisions, the BIA held (1) that a person has been compelled to undergo an abortion, for purposes of the asylum statute, when a reasonable person would objectively view the threat for refusing the abortion to be genuine, and when the threat, if executed, would itself amount to persecution, see In re T-Z-, 24 I. & N. Dec. 163 (BIA 2007); and (2) that an asylum applicant who has had a second child in the United States must have evidence that Chinese nationals with foreign-born children are subject to sterilization in their province of origin in order to show a reasonable fear of persecution, see In re C-C-, 23 I. & N. Dec. 899 (BIA 2006).

[3] As we discuss in detail, infra, § 1101(a)(42) makes a person eligible for asylum if (s)he was persecuted on account of "other resistance to a coercive population control program."

the IJ concluded that the mere fact that Cheng had two foreign-born children was not enough to satisfy her burden of establishing a likelihood that she would be sterilized if forced to return to China. The IJ concluded, finally, that Cheng was not eligible for withholding of removal or CAT relief.

The BIA affirmed the IJ's order in a single-member, non-precedential decision. In its decision, the Board relied primarily upon In re M-F-W- & L-G-, 24 I. & N. Dec. 633 (BIA 2008), a precedential decision issued after the IJ's second opinion wherein the BIA held (1) that the insertion of an IUD does not constitute persecution in and of itself absent aggravating circumstances, and (2) that the reinsertion of an IUD typically is not persecution on account of resistance to a family program, since women in China whose IUDs fall out or are removed always have the devices reinserted, whether or not they resisted the family planning program. See id. at 643 ("[B]ecause reinsertion is a standard procedure in China . . . [reinsertion of an IUD is] a routine medical procedure that is carried out regardless of the manner in which the first IUD was removed or fell out.").

Applying In re M-F-W- & L-G- to Cheng's case, the BIA held that the insertion of Cheng's IUD did not occur under sufficiently aggravating circumstances to constitute persecution. Even if the mandatory use of an IUD were sufficient to constitute persecution, moreover, the BIA concluded that Cheng had failed to establish a nexus between the acts complained of and her resistance to China's family planning program. As the BIA explained, "the respondent has offered no basis to show that the IUD was inserted because of her resistance to China's

-10-

family policy and not merely as part of a routine medical and family planning policy." (App. at 5.) Any economic harms Cheng experienced as a result of her township officials' actions, the Board stated, were not "substantial" enough to warrant a finding of persecution. (Id.) The BIA thus dismissed Cheng's appeal, and she thereafter filed a timely petition for review with this Court.

## II.

"Because the BIA issued an opinion, rather than a summary affirmance, we review the BIA's (rather than the IJ's) decision." Espinosa-Cortez v. Att'y Gen., 607 F.3d 101, 106 (3d Cir. 2010) (internal quotation marks and citation omitted). "We review the BIA's legal determinations de novo, subject to the principles of deference articulated in Chevron v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984)." Kaplun v. Att'y Gen., 602 F.3d 260, 265 (3d Cir. 2010) (citations omitted). We apply a deferential "substantial evidence" standard of review to the agency's factual findings. McAllister v. Att'y Gen., 444 F.3d 178, 185 (3d Cir. 2006). Under this standard, "we may reverse only if a reasonable adjudicator would be compelled to conclude to the contrary." Toure v. Att'y Gen., 443 F.3d 310, 316 (3d Cir. 2006) (quotation marks, brackets, and citation omitted); see also 8 U.S.C. § 1252(b)(4)(B); I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481 (1992). However, our deference under this standard "is expressly conditioned on support in the record," Toure, 443 F.3d at 316 (quotation marks and citation omitted), and "[t]he BIA may not ignore evidence in the record that favors the petitioner." Kang v. Att'y Gen., --- F.3d ----, 2010 WL 2680752, at *4 (3d

-11-

Cir. 2010) (citation omitted); accord Chavarria v. Gonzalez, 446 F.3d 508, 517 (3d Cir. 2006) ("[T]he requirement that the BIA's decision be supported by substantial evidence is not an empty one."); Valdiviezo-Galdamez v. Att'y Gen., 502 F.3d 285, 290-91 (3d Cir. 2007).

## III.

In 1996, Congress passed and President Clinton signed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Among other things, IIRIRA added the following language to the then-existing definition of "refugee" in the Immigration and Nationality Act ("INA"):

> [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

Pub. L. No. 104-208, Tit. VI-A, § 601(a)(1), 110 Stat. 3009-546, 3009-689 (codified at 8 U.S.C. § 1101(a)(42)). Cheng argues that being forced to wear an IUD constitutes "sterilization" for purposes of this statute, and that, alternatively, she was

-12-

persecuted on account of her resistance to China's coercive population control program. We review the IIRIRA-modified provisions of the INA before addressing the merits of Cheng's contentions.

**A.**

The INA gives the Attorney General the discretion to grant asylum to non-citizens who were persecuted in the country of their nationality or who have a reasonable fear of persecution on account of a variety of statutorily enumerated grounds. See 8 U.S.C. § 1158(b)(1)(A). The INA does not define the term "persecution," but instead orients the asylum provisions around the definition of the word "refugee." Prior to 1996, the INA defined "refugee" in relevant part as:

> [A]ny person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).[4]

---

[4] We recently outlined the bases for proving eligibility for asylum under this provision as follows:

-13-

In 1996, Congress passed IIRIRA, which, among other things, expanded the INA's definition of the term "refugee" to include persons who have been subjected to, or who reasonably fear being subjected to, persecution as a result of a coercive population control program. As we recently explained, Congress amended § 1101(a)(42)(A) "for the express purpose of overturning the BIA's decision in Matter of Chang, 20 I. & N.

> Under the terms of this provision, [an asylum applicant] may show that he is eligible for asylum by proving either that he was previously persecuted on account of a statutorily enumerated ground, or that he has a well-founded fear of future persecution on account of a statutorily enumerated ground. Persecution includes, but is not limited to, threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom.

Espinosa-Cortez, 607 F.3d at 107 (quotation marks and citations omitted). An asylum applicant who establishes that (s)he was previously persecuted on account of a statutorily enumerated ground is entitled to a rebuttable presumption that the applicant has a well-founded fear of future persecution. See Lukwago v. Ashcroft, 329 F.3d 157, 174 (3d Cir. 2003) (citation omitted). In the absence of such a presumption, the applicant must establish a well-founded fear of future persecution through proof of (1) a subjective fear of persecution (2) that is objectively reasonable. See Gomez-Zuluaga v. Att'y Gen., 527 F.3d 330, 346 (3d Cir. 2008).

-14-

Dec. 38 (B.I.A 1989)." <u>Lin-Zheng v. Att'y.Gen.</u>, 557 F.3d 147, 151 (3d Cir. 2009) (en banc) (citation omitted). In <u>Chang</u>, the BIA determined that it could not conclude "that implementation of the 'one couple, one child' policy in and of itself, even to the extent that involuntary sterilizations may occur, is persecution or creates a well-founded fear of persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion.'" 20 I. & N. Dec. at 44. The BIA reasoned that China's family planning policies were "solely tied to controlling population" and were not "a guise for acting against people for reasons protected by the Act," meaning that a person subjected to such policies could not be considered a victim of persecution. <u>Id.</u>

Congress concluded that this reasoning was "unduly restrictive," and expanded the definition of "refugee" to include certain victims of persecution related to coercive family planning and population control policies. H.R. Rep. No. 104-469(I), at 174 (1996). Congressman Christopher H. Smith succinctly summarized the expanded definition of "refugee" by explaining that "[f]orced abortion, forced sterilization, and other severe punishments inflicted on resisters to . . . [China's population control] program are persecution on account of political opinion." 142 Cong. Rec. H2589-01 (daily ed. Mar. 21, 1996) (comments of Rep. Smith).

As the BIA has since explained, the IIRIRA-amended definition of "refugee" creates four new categories of refugees who are eligible for asylum: (1) "person[s] who ha[ve] been forced to abort a pregnancy," (2) "person[s] who ha[ve] been forced . . . to undergo involuntary sterilization," (3) "person[s]

-15-

. . . who ha[ve] been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program," and (4) "person[s] who ha[ve] . . . a well founded fear that [they] will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance." 8 U.S.C. § 1101(a)(42)(A); see also In re M-F-W- & L-G-, 24 I. & N. Dec. at 635. "The first and second categories of aliens are 'deemed' by section 601(a) of the IIRIRA to be refugees," In re M-F-W- & L-G-, 24 I. & N. Dec. at 635—that is, under the plain language of the statute, a person who has been forced to undergo either an abortion or sterilization pursuant to a coercive population control program is automatically eligible for asylum. The third and fourth categories make asylum available to an immigrant who has not undergone compelled abortion or sterilization if the applicant can show past persecution for failing or refusing to undergo such a procedure or for otherwise resisting the population control program, or a well-founded fear of abortion, sterilization, or persecution on account of such failure, refusal, or resistance.

Cheng argues that she is eligible for asylum under the second, third, and fourth categories. She contends that being forced to wear an IUD is tantamount to sterilization, and that even if it were not, she was previously persecuted and has a well-founded fear of future persecution on account of her resistance to China's coercive population control policies. We consider these contentions in turn.

-16-

**B.**

As we noted above, under the plain language of the INA, if a non-citizen has been compelled to undergo an abortion or sterilization procedure, she is "deemed" to have been persecuted on account of political opinion and need not present evidence of the persecutor's motive. See 8 U.S.C. § 1101(a)(42)(A). Cheng argues that being compelled to wear an IUD and being forced to submit to regular gynecological examinations constitutes sterilization because it inhibits a woman's capacity to reproduce for as long as the IUD remains in place. That is, because under China's population control policies the IUD is to remain in place throughout a woman's reproductive life, Cheng argues that forced IUD insertion is tantamount to sterilization and is therefore per se persecution under the INA. See id. The BIA, interpreting the term "sterilization" in § 1101(a)(42)(A), has held otherwise, concluding that being forced to wear an IUD is different in kind from being forced to undergo a sterilization procedure. See In re M-F-W- & L-G-, 24 I. & N. Dec. at 636. For the following reasons, we conclude that the BIA's interpretation of the statutory term "sterilization" is entitled to deference and that Cheng's IUD-insertion-is-sterilization argument is unavailing.[5]

_____

[5] We are unpersuaded by the Respondent's suggestion that we lack jurisdiction to consider this issue because it was not raised before the BIA. The Respondent is correct that an immigrant must "raise or exhaust his or her remedies as to each claim or ground for relief [before the BIA] if he or she is to preserve the right of judicial review of that claim," and that this

-17-

In its recent precedential opinion, In re M-F-W- & L-G-, the BIA explained that although "[o]ne could argue that the perpetual use of an IUD, or any other birth control method, throughout a woman's child bearing years until menopause effectively results in a form of sterilization," the plain language and legislative history of the statute indicated that forced IUD

_____

waiver rule is jurisdictional. Hoxha v. Holder, 559 F.3d 157, 159 & n.3 (3d Cir. 2009) (quotation marks and citation omitted). However, while Cheng did not argue this issue when her appeal was before the BIA for the second time, her initial brief to the BIA (when the IJ certified the case to the Board) certainly can be read to raise this issue. In particular, Cheng argued in her initial brief that "[o]ne of the key issues presented for the Board's determination is whether the forced IUD insertion and gynecological exams are sufficient in itself [sic] for a finding of past persecution," and the Board addressed (and rejected) this argument in its first opinion. (App. at 194, 201 (emphasis added).) We have explained that "so long as an immigration petitioner makes some effort, however insufficient, to place the Board on notice of a straightforward issue being raised on appeal, a petitioner is deemed to have exhausted her administrative remedies," and Cheng's initial submission is more than sufficient to satisfy this undemanding standard. Lin v. Att'y Gen., 543 F.3d 114, 121 (3d Cir. 2008) (quoting Joseph v. Att'y Gen., 465 F.3d 123, 126 (3d Cir. 2006)). Nor was Cheng required to reargue the issue before the Board after the IJ's second decision, given that the Board already had the opportunity to address the issue in the first instance. See Popal v. Gonzales, 416 F.3d 249, 252 (3d Cir. 2005).

insertion was not per se persecution.  Id.  The BIA looked first to the statutory language, reasoning as follows:

> [T]he verb to "sterilize" is defined as "to make sterile," which means "[i]ncapable of sexual reproduction."  Webster's II New Riverside University Dictionary 1137 (1994).  This definition makes clear the permanency of the sterilization procedure—i.e., that it leaves one incapable of having children—and leads us to reject the argument that IUD use should be treated as the equivalent of sterilization.

Id.  The BIA explained that an IUD is "a method of birth control" that, in contrast with the permanency of sterilization, is "a temporary measure meant to provide for birth planning and not to remove all possibility of future birth opportunities."  Id. (emphasis omitted).  The Board confirmed its construction of the statutory language by looking to IIRIRA's legislative history.  As the Board explained, "Congress was clearly aware of China's use of IUDs as a birth control method separate from sterilization because both terms were used in describing China's family planning policy."  Id. (citation omitted).  If Congress had intended to include forced IUD insertion among the bases for per se refugee status (as it did with abortion and sterilization), the BIA reasoned, then it could have done so expressly.  See id. "It is harm of [the] magnitude and permanency [of abortion and sterilization] that Congress treated as automatically amounting to qualifying persecution."  Id. at 641.

Our analysis of whether or not to defer to In re M-F-W-

-19-

& L-G-—a precedential opinion of the BIA interpreting the statute that the agency is charged to implement—is governed by the familiar two-step inquiry of Chevron. See, e.g., Kaplun, 602 F.3d at 265. First, we assess "whether Congress has directly spoken to the precise question at issue." Ndayshimiye v. Att'y Gen., 557 F.3d 124, 129 (3d Cir. 2009) (quoting Chevron, 467 U.S. at 842). If the plain meaning of the statute is unambiguous, then the statutory text controls, and no deference to the agency's interpretation of that text is called for. See Chang v. I.N.S., 119 F.3d 1055, 1060 (3d Cir. 1997). If, however, "by employing traditional tools of statutory construction" we are unable to arrive at an unambiguous reading of the statutory language, Lee v. Ashcroft, 368 F.3d 218, 222 (3d Cir. 2004) (quotation marks and citation omitted), then "we proceed to the second step and determine whether the BIA's reading of the provision is a reasonable one." Ndayshimiye, 557 F.3d at 129 (citation omitted). If the agency's interpretation is reasonable, "we must let the interpretation stand." Id. To determine that the Board has reasonably construed the statute, we "need not conclude that the agency construction was the only one it permissibly could have adopted . . . or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." Chevron, 467 U.S. at 843 n.11 (citations omitted); see also Chang, 119 F.3d at 1060 ("[W]e will not substitute our own judgment for that of the BIA, but we must also reject any interpretation by the BIA that is 'arbitrary, capricious, or manifestly contrary to the statute.'" (quoting Chevron, 467 U.S. at 844)).

Turning to the first step of the inquiry, we must determine whether or not "Congress has directly spoken to the

precise question at issue," Chevron, 467 U.S. at 842—that question being whether § 1101(a)(42)'s use of the term "involuntary sterilization" encompasses compelled lifelong IUD usage. Cheng argues that the term "involuntary sterilization" unambiguously includes forced IUD insertion, contending that women who have been compelled to wear IUDs have undergone "an involuntary procedure which leaves them incapable of sexual reproduction." (Pet'r Br. 31.) According to Cheng, the fact that Congress did not specify any particular type of sterilization procedure (such as tubal ligation, vasectomy, or hysterectomy) indicates that Congress meant for the term "sterilization" to encompass any procedure that renders a person incapable of reproduction, including forced IUD insertion. Because under China's population control program, compelled IUD usage is accompanied by regular gynecological examinations to monitor the continued presence of the device, Cheng argues that forced IUD insertion leaves a woman permanently incapable of reproduction and thus is unambiguously a form of sterilization.

We cannot agree with Cheng that "Congress has directly spoken to the precise question" of whether sterilization encompasses the compelled use of a birth control device like an IUD. Chevron, 467 U.S. at 842. As the BIA reasoned in In re M-F-W- & L-G-, the plain meaning of the word "sterilization" does not unambiguously encompass temporary methods of inhibiting a person's reproduction such as the forced use of IUDs and other birth control devices. Webster's defines the word "sterilization" as "a procedure by which a human or other animal is made incapable of reproduction— compare CASTRATION, SPAYING." Webster's New Int'l Dictionary

-21-

2238 (3d ed. 1993). On its face, "sterilization" appears to include only procedures that permanently eliminate a person's reproductive capacity, as the dictionary references to such permanent and irreversible procedures as castration and spaying, and the use of the phrase "made incapable," make clear. Id.; see Gerber v. Hickman, 291 F.3d 617, 622 (9th Cir. 2002) (en banc) ("Sterilization is . . . permanent[] and irreparable."); Robinson v. Parrish, 720 F.2d 1548, 1550 (11th Cir. 1983) (per curiam) ("[S]terilization . . . [is a procedure that results in] the permanent inability to have children.") (quotation marks and citation omitted).

The forced insertion of an IUD certainly does not fall unambiguously within this category, since an IUD can be removed and its effect upon a woman's reproductive capacity eliminated.[6] Cheng attempts to undermine this distinction by

[6] Indeed, taken to its extreme, Cheng's attempt to read the permanency out of "sterilization" would lead to such bizarre propositions as considering the use of any contraceptive (such as a condom) to be "sterilization," since all contraceptives inhibit reproduction. At the risk of stating the obvious, the use of a contraceptive ordinarily would not amount to sterilization, since "[s]terilization is . . . permanent[] and irreparable" and the use of a contraceptive—even an IUD, which is designed to remain in place until removed by a physician—is not. Gerber, 291 F.3d at 622. Although the question of whether monitored, lifelong use of an IUD can be considered sterilization (because it is, in effect, a permanent or semi-permanent form of contraception) presents a closer call, under Chevron, close calls

-22-

noting that it is possible (although very difficult) to undo certain sterilization procedures, such as tubal ligation, and that the permanence of IUD insertion in China is all but guaranteed by the requirement of regular gynecological examinations. At most, however, Cheng's argument suggests that the term "sterilization" is ambiguous when applied at the margins to such non-obvious examples as semi-permanent and monitored IUD insertions, and when a statutory provision is ambiguous, Chevron dictates that we defer to the agency's reasonable construction of that provision. See, e.g., Ndayshimiye, 557 F.3d at 129.

We conclude that the term "involuntary sterilization" by definition contemplates a permanent inhibition of reproductive capacity, and we find that Congress has not directly spoken to the precise question of whether compelled IUD insertion, plus monitoring, falls within the ambit of the statutory term. See Huang v. Holder, 591 F.3d 124, 129 (2d Cir. 2010) (concluding at the first step of the Chevron analysis that "Congress has not determined whether . . . an IUD insertion constitutes sterilization").

Turning to the second step of the Chevron analysis, we further conclude that the BIA's interpretation of the statute is reasonable and entitled to deference. An agency's interpretation of the statute it is charged with administering is entitled to deference if it "represents a reasonable accommodation of

---

resolving ambiguous statutory terms may be for the agency, not the court, to decide.

-23-

conflicting policies that were committed to the agency's care by the statute . . . unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." Chevron, 467 U.S. at 845 (quoting United States v. Shimer, 367 U.S. 374, 383 (1961)).

Here, the Board's decision that forced IUD insertion is insufficiently permanent to constitute sterilization is not only a permissible construction of the statute's terms, but it also finds support in the legislative history of IIRIRA. As the BIA reasoned, the legislative history of IIRIRA reflects an understanding that sterilization and birth control methods (such as IUDs) are distinct means of inhibiting population growth. See In re M-F-W- & L-G-, 24 I. & N. Dec. at 636 ("Congress was clearly aware of China's use of IUDs as a birth control method separate from sterilization because both terms were used in describing China's family planning policy." (citation omitted)). For example, testimony before the House Subcommittee on International Operations and Human Rights catalogued the number of sterilizations, IUD insertions, and abortions in a given year, suggesting that sterilizations and IUD insertions are categorically distinct means of enforcing a population control program. See Coercive Population Control in China: Hearings Before the Subcomm. on Int'l Operations and Human Rights of the H. Comm. on Int'l Relations, 104th Cong. 8 (1995). Cheng has identified no contrary authority suggesting that Congress equated forced IUD insertion with sterilization.

In sum, we conclude that the BIA's construction of the statute is reasonable and entitled to deference. See Huang, 591

-24-

F.3d at 129-30 ("Under step two, we conclude that the BIA's conclusion that an involuntary IUD insertion is not an involuntary sterilization is permissible. The BIA's reasoning that sterilization makes one permanently incapable of having children, whereas an IUD is a temporary measure, is reasonable."). We thus reject Cheng's contention that IUD insertion is tantamount to sterilization.

## C.

The fact that IUD insertion is not equivalent to sterilization does not affect the remainder of Cheng's argument, which focuses on her more persuasive contention that she was persecuted, not sterilized. In particular, Cheng argues that she qualifies for asylum under § 1101(a)(42)'s prong authorizing the Attorney General to grant asylum to a non-citizen who was persecuted on account of the asylum applicant's "other resistance to a coercive population control program." We review the BIA's approach to "other resistance" claims, and explain why the Board's decision in this case is not supported by substantial evidence, in turn below.

## 1.

We have not, to date, had occasion to address the "other resistance" provision of § 1101(a)(42) in significant detail,[7] and

_____

[7] In Li v. Attorney General, 400 F.3d 157, 159 (3d Cir. 2005), we held that the petitioner had been subjected to economic persecution on account of his resistance to China's

indeed, very few courts have decided cases based upon the "other resistance" language.[8]  The BIA, however, discussed the provision in depth in In re M-F-W- & L-G- (the same 2008 decision, discussed supra, in which the Board held that forced IUD insertion is not tantamount to sterilization).  In that case, the petitioner's other resistance claim was based upon the fact that she removed an IUD that had been inserted after the birth of her first child; when the authorities discovered that the IUD had been removed, they took the petitioner to have an IUD reinserted after detaining her for three days.  24 I. & N. Dec. at

---

family planning policies, but our focus in that case was upon whether the petitioner had shown past economic persecution, not on the requirements for establishing an "other resistance" persecution claim.

[8]  No court appears to have decided an "other resistance" case since the BIA decided In re M-F-W- & L-G-.  Before the BIA's decision in that case, the most in-depth treatment of the "other resistance" language was the Ninth Circuit's en banc decision in Li v. Ashcroft, 356 F.3d 1153, 1156 (9th Cir. 2004), which held that where "a young woman who announced her opposition to government population control policies and is thereafter subjected to a forced gynecological exam and threatened with future abortion, sterilization of her boyfriend, and arrest," persecution on account of "other resistance" has been established.  The Ninth Circuit emphasized the "crude and aggressive" and "rape-like" nature of the examination procedure in concluding that the petitioner had been persecuted on account of her resistance to the family planning laws.  Id. at 1158 & n.4.

634-35.

Evaluating the petitioner's claim that she qualified for asylum based upon her resistance to the family planning policies, the BIA explained that, unlike persons who have been subjected to forced abortion or sterilization, who under the statute have per se been subjected to persecution on account of political opinion, see § 1101(a)(42), a person claiming to have been persecuted due to her resistance to a population control policy must still prove that she was persecuted and that the persecution was on account of such resistance. Specifically, the Board held that in order to proceed under the "other resistance" provision, the asylum applicant must prove that "(1) she resisted China's family planning policy, (2) she has been persecuted (or has a well-founded fear of persecution), and (3) the persecution was or would be because of the respondent's resistance to the policy." In re M-F-W- & L-G-, 24 I. & N. Dec. at 637 (citation omitted).

The BIA interpreted the first of these prongs—resistance—broadly, explaining that acts such as removing an IUD or refusing to attend a gynecological appointment satisfy the statutory element of resistance "because such acts, while arguably not comprising active or forceful opposition to China's family planning policy, would certainly thwart the goals of the plan and be viewed with disfavor by Chinese officials implementing the plan." Id. at 638. By contrast, the BIA explained that "simple grudging compliance" with the population control program would not amount to resistance. Id.

As to the second prong—persecution—the Board explained that "the words 'persecuted' and 'persecution' in [the IIRIRA-modified language within the INA's definition of 'refugee'] derive their meaning from the standard use of these terms in contexts other than those related to population control. They do not enjoy some special separate meaning within the context of [population control] cases." Id. at 639. Assessing whether compelled IUD insertion in and of itself is persecutory, the Board noted that although the involuntary insertion of an IUD is intrusive, the procedure is typically painless and its effects are temporary. The Board explained:

> [S]imply requiring a woman to use an IUD, and other more routine methods of China's implementation of its family planning policy, do not generally rise to the level of harm required to establish persecution . . . . [E]xamples of routine acts implementing China's family planning policy that are lacking in harm sufficient to constitute persecution include reinsertion of an IUD after the removal of an IUD, fines for having removed the IUD that are not excessive, regularly required gynecological exams, and other routine fines and threats for disobeying the policy.

Id. at 640-41 (citations omitted). The BIA made clear that having an IUD inserted could amount to persecution in some situations, but it explained that in order "to rise to the level of harm necessary to constitute 'persecution,' the insertion of an IUD must involve aggravating circumstances." Id. at 642. The Board did not elaborate upon the circumstances that would be

-28-

sufficiently aggravating to make forced IUD insertion persecutory in and of itself.

Finally, the BIA explained that there must be a nexus between the persecution and the person's resistance to the population control program in order for a non-citizen to qualify for asylum, and that in the context of IUD insertion, this nexus may be difficult to establish. See id. at 642-43. The Board reasoned:

> The question raised here and in many "other resistance" cases is whether the reinsertion of an IUD was because of the alien's resistance to the insertion of the first IUD, or because of its removal, or merely because reinsertion is a standard procedure in China. If the latter, an alien may be unable to meet her burden of establishing that the IUD insertion was "for," or because of, her resistance to China's policies. Rather, it would then be a routine medical procedure that is carried out regardless of the manner in which the first IUD was removed or fell out. This would not be sufficient to establish the nexus required under section 101(a)(42) of the Act.

Id. at 643. The Board concluded that the petitioner had merely experienced the routine implementation of China's family planning policy; the forced insertion of an IUD in that case was insufficiently harmful to constitute persecution and was not related to the petitioner's resistance to the policy. See id. at 644.

-29-

**2.**

Applying the framework of In re M-F-W- & L-G- to this case, the BIA, in a single-member, non-precedential decision, concluded that Cheng failed to demonstrate that she had been persecuted or that she had a reasonable fear of future persecution on account of her resistance to China's population control policies. With regard to the resistance prong, the Board appears to have assumed that Cheng's conduct amounted to resistance to the one-child policy. The BIA concluded, however, that Cheng did not satisfy the persecution or nexus prongs. As we now explain, we agree with Cheng that the Board's analysis of both the persecution and nexus prongs is not supported by substantial evidence, and we therefore grant the petition for review.

### a. **Resistance**

As an initial point, there can be no doubt that Cheng resisted China's population control policies (and, as we have noted, the Board assumed as much). In In re M-F-W- & L-G-, the BIA explained that actions that "thwart the goals of the [population control] plan and [are] viewed with disfavor by Chinese officials implementing the plan" constitute "resistance" under § 1101(a)(42), even if the actions are not "forceful." 24 I. & N. Dec. at 638. Cheng repeatedly refused to comply with multiple officials' increasingly strenuous demands that she abort her first pregnancy, provoking "fur[y]," escalating threats, and various enforcement actions on the part of the officials. (App. at 736.) Cheng fled the township to have her baby, defied orders that she undergo a sterilization procedure, had to be

-30-

dragged to the clinic to have the IUD inserted, and missed multiple gynecological appointments. Her actions were significantly more defiant of China's family planning policies than were the more limited actions held to constitute resistance in In re M-F-W- & L-G-.

Although the Government did not make the point in its brief, at oral argument, it appeared for the first time to suggest that Cheng's resistance to the officials' demands that she undergo an abortion was not "resistance to a coercive population control program" within the meaning of the INA because Cheng was unmarried at the time when her acts of resistance transpired. 8 U.S.C. § 1101(a)(42). The Government argues that China's laws forbidding unmarried couples from procreating are not part of a "population control program," but are instead aimed at preventing people from having illegitimate children, and so Cheng's resistance was to China's illegitimacy laws, not its population control laws. Id.

We reject this singularly unpersuasive contention. The Country Report prepared by the State Department addresses asylum claims based upon China's National Marriage Law (which proscribes procreation by unmarried couples) under the umbrella of "claims based on population policies" and "claims based on coercive family planning."[9] (App. at 442

_____

[9] We have recognized that such reports are "the most appropriate and perhaps the best resource for information on political situations in foreign nations." McAllister, 444 F.3d at 189 (quotation marks and citation omitted).

(capitalization omitted, emphasis added).) The Report thus indicates that the restriction on procreation by unmarried couples is a component of China's population control regime, and the Government has identified no evidence supporting a contrary conclusion.[10] Moreover, the Report's treatment of the National Marriage Law as part and parcel of the population control program is eminently sensible. China's one-child-per-couple policy is well-known, (id. at 443), and it would obviously undermine the population control program if married Chinese couples were held to a one-child limit but unmarried couples could procreate without restriction. In sum, China's prohibition on procreation by unmarried couples is undeniably part of the population control program, and the uncontradicted evidence conclusively establishes that Cheng resisted that program.[11]

---

[10] Indeed, the Government's own brief likewise treats the National Marriage Law as a component of China's population control program, notwithstanding its contention at oral argument that the ban on procreation by unmarried couples is not part of the population control policy. (Resp't Br. 24.)

[11] Our concurring colleague takes issue with the BIA's broad interpretation of the resistance prong and would hold that the phrase "resistance to a coercive population control program" should be restricted "to resistence only to abortion or sterilization procedures, not to resistence to any method of population control." (Concurring Op. at 1.) The principles of Chevron deference and the language of § 1101(a)(42) compel us to disagree. Because the text of § 1101(a)(42) does not clearly and unambiguously indicate that Congress intended the phrase

-32-

## b. **Persecution**

With respect to whether she was persecuted, Cheng argues that the Board gave little or no consideration to the circumstances that distinguish her case from the mill-run IUD insertion case. In effect, Cheng contends that in focusing on the IUD insertion itself without looking at the pattern of mistreatment within which it occurred, the Board missed the forest (the persecution) for the trees (the IUD insertion). For the following reasons, we agree that the Board's conclusory statement that Cheng "has not shown aggravating

---

"coercive population control program" to include only abortion and sterilization, the BIA's reasonable interpretation of the provision as encompassing methods of population control other than abortion and sterilization, such as the forced insertion of IUDs, is entitled to deference under Chevron. See Chang, 119 F.3d at 1060. Further, as the concurring opinion itself recognizes, courts—including this Court—have routinely interpreted the phrase "resistance to a coercive population control program" to extend beyond acts of resistance to abortion and sterilization alone. See, e.g., Huang v. Att'y General, --- F.3d ----, 2010 WL 3489543, at *5 n.5 (3d Cir. 2010) (observing in dicta that "[m]andatory birth-control measures short of abortion or sterilization, such as insertion of an IUD or required gynecological screenings . . . . qualify as a 'coercive population control program'"); Li, 400 F.3d at 159 (having four children in violation of the one-child policy is resistance to population control regime); Li, 356 F.3d at 1156 (declaring intent to have multiple children is resistance to population control program).

circumstances" is not supported by substantial evidence.[12]  (Id. at 11.)  In our view, the Board may not, in determining whether an asylum applicant suffered past persecution, take a single instance of mistreatment (here, the IUD insertion) from a larger pattern of abuse and confine its persecution analysis to the question of whether that single instance was, in and of itself, persecutory.  Instead, "[i]ncidents alleged to constitute persecution . . . must be considered cumulatively." Edimo-Doualla v. Gonzales, 464 F.3d 276, 283 (2d Cir. 2006) (Sotomayor, J.) (citations omitted).

Persecution, we have made clear, "is an extreme concept that does not include every sort of treatment our society regards as offensive."  Jarbough v. Att'y Gen., 483 F.3d 184, 191 (3d Cir. 2007) (quoting Fatin v. I.N.S., 12 F.3d 1233, 1243 (3d Cir. 1993)); accord Gomez-Zuluaga v. Att'y Gen., 527 F.3d 330, 341

---

[12]  The Government does not appear to suggest that the Board's treatment of the persecution issue was in fact adequate. Instead, the Government contends that the BIA "presumed without deciding" that Cheng was persecuted and rested its holding exclusively on the nexus prong.  (Resp't Br. 21.)  The Government misreads the BIA's decision.  After discussing the nexus issue, the BIA stated that Cheng "also has not shown aggravating circumstances" and that she failed "to demonstrate the substantial economic disadvantage necessary for . . . a finding of persecution."  (App. at 5 (emphasis added).) Although it did so in terms that might generously be described as succinct, the Board did purport to resolve the persecution issue.

-34-

(3d Cir. 2008) (stating that persecution does not encompass "every act that our society might regard as unfair, unjust, unlawful, or unconstitutional"). Our oft-quoted, non-exclusive list of examples of persecution "include[s] threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." Fatin, 12 F.3d at 1240. But while the concept of persecution is "extreme," id. at 1243, it is not an impossible standard to satisfy. The BIA, relying upon the legislative history of the INA, has emphasized that "[t]he harm or suffering need not [only] be physical, but may take other forms, such as the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life," and that, with regard to the non-physical aspects of persecution, an applicant "need not demonstrate a total deprivation of livelihood or a total withdrawal of all economic opportunity in order to demonstrate harm amounting to persecution." In re T-Z, 24 I. & N. Dec. 163, 171, 173 (BIA 2007) (quoting H.R. Rep. No. 95-1452, at 5 (1978)); accord Li v. Att'y Gen., 400 F.3d 157, 169 (3d Cir. 2005); see also I.N.S. v. Stevic, 467 U.S. 407, 428 n.22 (1984) (explaining that persecution is a "broader concept than threats to life or freedom"); Ngengwe, 543 F.3d at 1036; Chanchavac v. I.N.S., 207 F.3d 584, 589 (9th Cir. 2000); Marquez v. I.N.S., 105 F.3d 374, 379 (7th Cir. 1997).

Moreover, in determining whether actual or threatened mistreatment amounts to persecution, "[t]he cumulative effect of the applicant's experience must be taken into account" because "[t]aking isolated incidents out of context may be misleading." Manzur v. Dep't of Homeland Sec., 494 F.3d 281, 290 (2d Cir. 2007) (quotation marks and citations omitted);

-35-

accord Gomez-Zuluaga, 527 F.3d at 343 (explaining that we do not evaluate incidents in a vacuum, but instead must examine them "in the context of the . . . overall trajectory" of mistreatment); Toure, 443 F.3d at 318 (assessing events underlying persecution claim "[i]n the aggregate" (citation omitted)); Li, 400 F.3d at 169 (same); Ngengwe, 543 F.3d at 1036; In re O-Z- & I-Z; 22 I. & N. Dec. 23, 25-26 (BIA 1998).

Even if one incident of mistreatment is not, in and of itself, severe enough to constitute persecution, a series of incidents of physical or economic mistreatment could, taken together, be sufficiently abusive to amount to persecution. See Edimo-Doualla, 464 F.3d at 283. "Where no single incident stands out above the others, sometimes a small incident may be 'the last straw'; and although no single incident may be sufficient, all the incidents related by the applicant taken together, could make [the applicant's] fear 'well-founded.'" Poradisova v. Gonzales, 420 F.3d 70, 80 (2d Cir. 2005) (quoting Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees ¶ 201 (Geneva 1992)).[13]

In this case, the Board stated that, beyond the insertion of

_____

[13] The Supreme Court has noted that the Handbook quoted in Poradisova "provides significant guidance in construing the Protocol, to which Congress sought to conform," even though the Handbook is not binding authority. I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 439 n.22 (1987).

-36-

an IUD, Cheng "has not shown aggravating circumstances." (App. at 5.) In reaching this conclusion, however, the Board did not take into account many of the acts of mistreatment unequivocally established by Cheng's uncontradicted evidence. First, the Board failed to consider some of the most serious threats levelled at Cheng, including the officials' statement that they would take her daughter from her and their threat to detain her boyfriend for months if she did not comply with their demand that she undergo a sterilization procedure. These threats are unquestionably relevant to the question of whether Cheng experienced past persecution (and whether she has a reasonable fear of future persecution). Cf. Ngengwe, 543 F.3d at 1037 (explaining that "[t]he IJ did not consider Ngengwe's argument that her in-laws . . . threatened to take her children," a fact that is material to the assessment of "whether non-physical persecution occurred"). The threats are, we note, especially important in light of the fact that individual instances of mistreatment must be assessed within the "overall trajectory of the harassment," which in this case, as the fulfillment of the threat to take Cheng's farm demonstrates, is one of escalating and consummated threats. Gomez-Zuluaga, 527 F.3d at 343 (further explaining that "[w]eighing this final incident in the context of the prior incidents shows that Petitioner's allegations regarding the imminence and menacing nature of the [earlier] threats are justified"); accord Manzur, 494 F.3d at 290; Edimo-Doualla, 464 F.3d at 283.

Moreover, the Board did not mention Cheng's testimony, found credible by the IJ, that the IUD insertion procedure was performed in a hurried and improper manner that caused her extreme pain. This fact is significant to the persecution analysis

-37-

because the BIA's conclusion in In re M-F-W- & L-G- that an IUD insertion did not itself constitute persecution rested in no small part upon its understanding that IUD insertion "typically does not cause substantial pain or lasting side effects." 24 I. & N. Dec. at 641 (citation omitted); see Li v. Gonzales, 405 F.3d 171, 179 (4th Cir. 2005) (explaining, pre-In re M-F-W- & L-G, that IUD insertion could constitute persecution if the "manner or means" of insertion were harsh or atypical or if the procedure were accompanied by "force, physical abuse, or other equivalent circumstances").

Finally, and most importantly, the Board did not adequately address the significance of the financial hardships imposed upon Cheng in direct response to her resistance to the family planning officials' orders. We have been clear that "economic deprivation, if sufficiently severe, can constitute persecution within the meaning of asylum law." Li, 400 F.3d at 159. In Li, for example, the petitioner was fined the equivalent of twenty months' salary, was blacklisted from government employment, and had various household items confiscated on account of his resistance to China's one-child policy. See id. Li was, however, able to get by with "some temporary jobs." Id. at 160 (quotation marks omitted). We explained that although "Li's family did not reach near-starvation levels, we can fairly say that the economic restrictions allegedly faced by the Li family were 'severe' . . . . [because for] a relatively poor family[, such hardships] . . . could threaten [their] freedom if not their lives." Id. at 169. We emphasized that the economic deprivations visited upon Li were "deliberately imposed as a form of punishment because of his violation of China's population control policy, rather than being the result of

-38-

'natural' economic downturns or generally harsh conditions shared by others in China." Id.; accord Boykov v. I.N.S., 109 F.3d 413, 417 (7th Cir. 1997) (explaining that the "economic harm required . . . [to show persecution] must be deliberately imposed as a form of punishment" (quotation marks, citations, and some alterations omitted)). We held, in short, that when an economic sanction is sufficiently severe, and where it is deliberately imposed by the government as punishment, economic persecution may be established. See Li, 400 F.3d at 169.

We are not alone in recognizing that severe economic sanctions constitute persecution within the meaning of the INA, see, e.g., Ahmed v. Gonzales, 467 F.3d 669, 673 (7th Cir. 2006), and the BIA itself previously reached the same conclusion, emphasizing that Congress intended the concept of persecution to reach not only physical harm, but also "deprivation[s] of liberty, food, housing, employment or other essentials of life." In re T-Z, 24 I. & N. Dec. at 171 (quoting H.R. Rep. No. 95-1452, at 5 (emphasis omitted)). Indeed, consideration of the economic aspects of persecution in the context of China's coercive population control measures is especially appropriate in light of the legislative history of IIRIRA. Both the House and Senate Reports for IIRIRA recognized that "[c]ouples with unauthorized children are subjected to excessive fines, and sometimes their homes and possessions are destroyed," and emphasized that "[t]he United States should not deny protection to persons subjected to such treatment." H.R. Rep. No. 104-469(I), at 174; see also S. Rep. No. 104-95, at 92 (1995).

Cheng's uncontested and credible evidence shows that

-39-

she was subjected to such treatment.  After Cheng refused to comply with the officials' orders that she have an abortion, local government officials confiscated her family farm and truck, and forbade the entire family from working on the farm.  Cheng's credible testimony made unmistakably clear the devastating impact that such a deprivation imposed upon her and her family—she stated in no uncertain terms that the family "depended on the farm to make a living," a fact that the IJ appears to have credited when describing the "serious" impact that even a modest fine would have on a family of the Chengs' limited means.[14]  (App. at 76, 736.)

The BIA's discussion of Cheng's economic persecution was limited to its statement that Cheng "has failed to demonstrate the substantial economic disadvantage necessary for such a finding of persecution." (Id. at 5.)  This statement is not supported by substantial evidence.  The imposition of "modest fines" is, of course, insufficient to rise to the level of persecution. Huang v. I.N.S., 421 F.3d 125, 129 (2d Cir. 2005) (per curiam); accord In re M-F-W- & L-G-, 24 I. & N. Dec. at 641 (explaining that "fines . . . that are not excessive" do not amount to persecution).  But "an extraordinarily severe fine or wholesale seizure of assets may be so severe as to amount to

---

[14]  We do not overlook the fact that, as in Li, Cheng was able to "get by" with a job she located in another city.  Li, 400 F.3d at 167.  We and the BIA have recognized that an asylum applicant need not necessarily "reach near-starvation levels" in order for severe economic sanctions to constitute persecution. Id. at 169; accord In re T-Z, 24 I. & N. Dec. at 171.

persecution, even though the basic necessities of life might still be attainable." In re T-Z, 24 I. & N. at 171 (citation omitted); accord Li, 400 F.3d at 169. A wholesale seizure of assets is precisely what occurred here, as the uncontradicted facts credited by the IJ clearly establish. Surely the seizure of property as significant as the family farm and truck, when those very assets served as the exclusive source of the family's livelihood, (App. at 736), constitutes a severe economic sanction that "could threaten [the] family's freedom if not their lives." Li, 400 F.3d at 169. And, as was the case in Li, there can be no doubt that Cheng's financial hardship was imposed as a sanction and was not the product of natural shifts in economic conditions; as in Li, the confiscation of the farm was "imposed as a form of punishment because of [Cheng's] violation of China's population control policy." Id.

We conclude, in sum, that the BIA's analysis of past persecution, which failed to consider credible evidence of past persecution in Cheng's case and did not address the impact of the severe economic sanctions imposed upon Cheng, is not supported by substantial evidence. See Espinosa-Cortez, 607 F.3d at 113-14 ("An applicant for asylum is entitled to a reasoned analysis, not one which wholly disregards relevant, probative evidence." (quoting Mema v. Gonzales, 474 F.3d 412, 419 (7th Cir. 2007))); accord Kang, 2010 WL 2680752, at *4. It is clear that by focusing exclusively on the forced insertion of an IUD to the exclusion of all other evidence of mistreatment, the BIA failed to consider "[t]he cumulative effect of [Cheng's] experience." Manzur, 494 F.3d at 290. We agree with Cheng that when considered "[i]n the aggregate," Toure, 443 F.3d at 318, the mistreatment she experienced—including the

-41-

confiscation of the farm and truck upon which her family's livelihood depended, the threat to take her daughter from her and continue to detain her boyfriend, the forced insertion of an IUD under circumstances that caused intense physical pain, and the imposition of fines for having an unauthorized child and for missing gynecological appointments—compels the conclusion that she suffered past persecution.

### c. **Nexus**

Finally, we agree with Cheng that the BIA's conclusion that there was no nexus between her acts of resistance and the mistreatment visited upon her is not supported by substantial evidence. The BIA's analysis of this issue was brief—it explained, citing In re M-F-W- & L-G-, that "where the insertion or reinsertion of an IUD is carried out as part of a routine medical procedure, an alien will have difficulty showing the required nexus, i.e., that the procedure was . . . because of her resistance to China's family planning policy." (App. at 4.) The BIA concluded that Cheng "offered no basis to show that the IUD was inserted because of her resistance to China's family policy and not merely as part of a routine medical and family planning policy." (Id. at 5.) The Board stated that Cheng had merely shown "an act of resistance and an unconnected imposition of harm." (Id.)

A reasonable adjudicator, we conclude, would be compelled to disagree. As with its persecution analysis, the BIA's conclusion that the mistreatment Cheng suffered was "unconnected" to her defiance of the population control regime stems from its focus upon the IUD insertion alone without

-42-

regard to the history of mistreatment within which it transpired. (Id.) Such an analytical error can be significant not just to the issue of persecution, but also to the nexus prong. As the Second Circuit has noted, not only is it possible that an "accumulation of harm from the individual incidents may rise to the level necessary for persecution even though an individual incident may not," but that same accumulation or trajectory of mistreatment may itself provide circumstantial evidence of the alleged persecutor's motive in the absence of direct evidence of motive or nexus. Manzur, 494 F.3d at 290. As the court went on to explain:

> [T]he motive for the harm inflicted must be analyzed in light of the context in which the harm occurred. The pattern provides context for the petitioners' claims and may lend evidentiary support to a conclusion that individual incidents of harm were in fact "on account of" a ground protected by the Act . . . .

Id. (quotation marks and internal citation omitted); cf. Espinosa-Cortez, 607 F.3d at 108-09 (noting that "the INA makes motive critical," but an asylum applicant may rely on circumstantial evidence of the persecutor's motive, since "persecutors are hardly likely to submit declarations explaining exactly what motivated them to act" (quotation marks and citations omitted)). Put differently, where direct evidence of a nexus between an act of resistance and an act of mistreatment (such as IUD insertion) is lacking, the trajectory of abuse may provide circumstantial evidence of motive, and such a trajectory must be accounted for in the nexus analysis. See Manzur, 494

-43-

F.3d at 290.

In Cheng's case, such circumstantial evidence is unnecessary to establish the nexus between her mistreatment and her defiance of the family planning policies, because ample direct evidence, credited in its entirety by the IJ, compels the conclusion that she was persecuted on account of her resistance. See Baghdasaryan v. Holder, 592 F.3d 1018, 1025 (9th Cir. 2010) ("Because the BIA ignored this compelling evidence of nexus, its conclusion that [petitioner] failed to establish nexus is not supported by substantial evidence."). As Cheng correctly argues, "in every instance that [she] had an opportunity to comply with family planning officials, she chose to resist." (Pet'r Br. 27.) More to the point, the record unequivocally establishes that in response to each of these acts of resistance, officials threatened and punished her, and in each instance the officials expressly linked the sanctions to Cheng's defiance of the family planning policies—if Cheng did not agree to have an abortion, she would lose her job and be forced to terminate her pregnancy; because Cheng did not terminate her pregnancy, officials confiscated her family farm and truck and forbade her from working on the farm; if Cheng did not agree to be sterilized, her daughter would be taken from her and the detention of her boyfriend would be prolonged; because Cheng had an illegitimate child, she was forced to pay social compensation fees to send her daughter to daycare; and because Cheng missed gynecological examinations, she was assessed fines that she could not afford to pay. The IJ found the entirety of Cheng's account of these facts credible—as the Board itself acknowledged, "the facts of this case are not in serious dispute." (App. at 5.) In light of this abundance of credible evidence

-44-

expressly linking the mistreatment Cheng suffered to her resistance to the population control program, we conclude that "a reasonable adjudicator would be compelled" to reject the BIA's characterization of these harms as being unrelated to her acts of resistance. Toure, 443 F.3d at 316 (quotation marks, alteration, and citation omitted).

The Board concluded otherwise by treating the IUD insertion as the only relevant act of mistreatment, apparently relegating the remainder of Cheng's experiences to a category of "aggravating circumstances" that it decided are pertinent only to the question of whether the IUD insertion itself was sufficiently harmful to constitute persecution. But the INA calls for a determination of persecution, not aggravating circumstances, and, as we have explained, the events underlying a claim of persecution must be viewed in the aggregate. See, e.g., Li, 400 F.3d at 169; Manzur, 494 F.3d at 290. Here, with the arguable exception of the IUD insertion itself, there was an express, undeniable link between each such event and Cheng's resistance to the population control regime. No reasonable adjudicator could conclude that these events were "unconnected" to Cheng's acts of resistance, irrespective of whether the act of inserting an IUD was a routine family planning procedure. (App. at 5.) We conclude that these expressly linked acts of abuse amount to past persecution with a nexus to Cheng's resistance, meaning that the Board's determination that Cheng failed to satisfy the nexus element of her other resistance claim is not supported by substantial evidence.

-45-

## IV.

As we have explained, "the undisputed record evidence compels the conclusion" that Cheng was persecuted on account of her resistance to China's coercive population control policies.[15] Ghebremedhin v. Ashcroft, 392 F.3d 241, 243 (7th Cir. 2004). Although we find that the evidence unequivocally demonstrates that Cheng satisfied the resistance, persecution, and nexus prongs, the ultimate decision concerning Cheng's eligibility for asylum is the agency's, not ours, to make. See Gonzales v. Thomas, 547 U.S. 183, 186 (2006) (per curiam) (holding that "the law's ordinary remand requirement" compels remand to the agency to make the final decision as to asylum eligibility); accord I.N.S. v. Orlando Ventura, 537 U.S. 12, 16 (2002) (per curiam); Ghebremedhin, 392 F.3d at 243 (concluding that "the power to grant asylum is vested solely in the hands of the Attorney General, and . . . even if an alien is otherwise eligible, the Attorney General is empowered by statute to deny relief") (citations omitted). We therefore grant Cheng's petition for review and remand to the BIA for further proceedings consistent with this opinion.

---

[15] Because we find that the Board's decision on past persecution is not supported by substantial evidence, we need not address its conclusion regarding the likelihood of future persecution or its dismissal of Cheng's claims for withholding of removal and CAT relief.

ROTH, <u>Circuit Judge</u>, concurring:

The majority concludes that resistance to a coercive population control program includes resistance to China's ban on procreation by unmarried couples and resistance to the insertion of an IUD. The majority has remanded this case to the BIA for reconsideration of the credible evidence of past persecution, including persecution for resistance to the insertion of the IUD. I believe, however, that the "resistance" language of the statute refers only to resistance to abortion or sterilization. In my opinion, the remand should only consider resistance to these latter two procedures. For that reason, I write separately to address the BIA's interpretation of the phrase "other resistance to a coercive population control program." 8 U.S.C. § 1101(a)(42).

Because of the structure of section 1101(a)(42), with the first two phrases of the sentence referring exclusively to those individuals who have been forced to undergo abortion or a sterilization procedure and to individuals who have been persecuted for failure or refusal to undergo such a procedure, I conclude that the third phrase, directed at *resistance* to a "coercive population control program" refers to resistance only to abortion or sterilization procedures, not to resistance to *any* method of population control, including, in this instance, IUD insertion. The courts that have examined this issue do not agree with me, but I submit that they have interpreted the statute in the manner that they did because the petitioners before them had been forced to undergo the insertion of an IUD and thus the briefing was skewed in that direction without considering whether it was the correct direction.

Contrary to the interpretations to date of section 1101(a)(42), I conclude that Congress intended the phrase "other resistance" to be interpreted as referring to activities of individuals who are resisting or opposing China's population control policy. Such activities and individuals might include, for example, a doctor's refusal to perform abortion or sterilization procedures, a conscientious objector's circulation of material supporting the ban of abortion and sterilization procedures, or an activist's organization of public

demonstrations in opposition to forced abortion and sterilization.

If the language of section 1101(a)(42) is interpreted as encompassing *all* actions that "thwart the goals of the [population control] plan and [are] viewed with disfavor by Chinese officials implementing the plan . . .", *In re M-F-W- & L-G-*, 24 I. & N. Dec. 633 (BIA 2008), its scope is too broad and goes beyond what I find to be Congress's intent. Without a narrower interpretation of this phrase, section 1101(a)(42) could be read to apply to any method of birth control, including, among others, condoms or abstinence. Such a broad interpretation would effectively "afford a safe harbor to all those Chinese who chafe under [China's population control program]." *Li v. Ashcroft*, 356 F.3d 1153, 1170 (9th Cir. 2004) (Kleinfeld, J., dissenting). This cannot be what Congress intended. As Judge Kleinfeld commented in dissent:

> [Pursuant to 8 U.S.C. § 1157(a)(5)], [t]here are only 1,000 asylum spots a year for those seeking asylum under [8 U.S.C. § 1101(a)(42)], which arguably extended its succor only to those most brutalized by Chinese family policy. By broadening the grant to those who are most peripheral to this class . . . we may well be withdrawing American protection from those at the heart of it, persons subjected to forced abortions and sterilizations. The

2

> compassion felt by the majority
> risks a cruel irony of denial of
> compassion to those who need it
> most.

*Id*. (footnote omitted).

For the reasons articulated above, I respectfully concur.

---

[1]

The numerical limitation set forth in 8 U.S.C. § 1157(a)(5) was repealed in 2005. *See* Pub.L. 109-13, Div. B, Title I, § 101(g)(2), May 11, 2005, 119 Stat. 305. The President is now empowered to set, on an annual basis, "the number of refugees who may be admitted under [8 U.S.C. § 1157(a)] . . . ." For Fiscal Year 2010, President Barack Obama determined that no more than 17,000 refugees from East Asia will be granted refugee status. *See* Presidential Determination No. 2008-29, Sept. 30, 2008, 73 F.R. 52385. Although the allocation has changed since Judge Kleinfeld's dissent was issued, because a limit on the number of refugees that may be granted asylum still exists, his reasoning supporting a narrow construction of the phrase "other resistance to a coercive population control program" remains persuasive.

3